**FILED** E.C

7/27/2023

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| David Gordon Oppenheimer, | |
| Plaintiff, | Case No. 1:21-cv-02961 |
| v | Dist. Judge Andrea R. Wood |
| First Step Trademarks, LLC and Alexander C. Dulac | Mag. Judge Jeffrey T. Gilbert |
| Defendants. | |

## MOTION TO DISMISSAL AGAINST MR. DULAC
## FOR VIOLATION OF THE DISCHARGE INJUNCTION

Alexander Dulac ("Dulac" or "Non-Debtor"), pro se, and officer of First Step
Trademarks, LLC ("FST", "Debtor" or "Company") respectfully submits this motion to dismiss
the suit by Plaintiff, David Gordon Oppenheimer ("Plaintiff" or "Oppenheimer") (together "the
Motion").

### PRELIMINARY STATEMENT

FST entered into Chapter 11 bankruptcy in the United States Bankruptcy Court for the
Southern District of New York ("Bankruptcy Court") on December 31, 2022 and emerged from
bankruptcy on February 7, 2023. The Court in Illinois was provided notice of the bankruptcy by
FST's bankruptcy counsel on January 11, 2022 and the Plaintiff, who is one of the listed
creditors, has been receiving all bankruptcy notices, which have been sent to his attorney Ilya
Zlatkin. Despite numerous warnings, Plaintiff and his counsel, Ilya Zlatkin, continue to willfully
violate the automatic stay, pursuant to Section 362(a) of the Bankruptcy Code, protecting the
Debtor during the proceedings and now post-discharge in an attempt to force a settlement.

Beyond pursuing the suit against FST, Mr. Oppenheimer continues to pursue a suit against Mr. Dulac, an officer, and a Managing Director of FST, in an attempt to pierce the corporate veil with Plaintiff previously stating that "Oppenheimer would be able to pierce FST's corporate veil to access Dulac's (i.e., the non-debtor's) assets, if Oppenheimer prevailed on his claims in this case." As Plaintiff is aware, Mr. Dulac is indemnified by the Company and therefore any damages or settlement would directly harm the estate of the Debtor ("Estate"). More specifically, per FST's LLC Agreement, Mr. Dulac is fully indemnified by FST against any lawsuits "including without limitation, indemnification against active or passive negligence, or breach of duty". As an indemnified party, Mr. Dulac has "claim against the **property and assets** of the **Company** for payment of any indemnity amounts" amongst other rights, which also impact the Debtor, its Estate and its Asset. The amended plan of reorganization dated November 21, 2022 (the "Plan"), confirmed on February 7, 2023 and signed by Judge James L. Garrity, Jr from the Bankruptcy Court (the "Confirmation Order), issued an injunction prohibiting Plaintiff from (1) conducting and continuing any suit or (2) collecting any judgement or award **directly or indirectly** against the Debtor or the **assets of the Debtor**. The (1) conducting and continuation of this suit against Mr. Dulac, which pre-dates the bankruptcy filing and continues to take hundreds of hours away from running the business on behalf of creditors, and (2) any related judgement or awards against Mr. Dulac (where Plaintiff is seeking in his initial complaint between $30,000 and $150,000 for any act of infringement, plus fees and legal expenses per their initial complaint) is in violation of the Bankruptcy Court discharge injunction ("Injunction"). Beyond irreparably hurting the Debtor, its Assets and Estate, any damages or awards would lead to insolvency.

Defendant Dulac, pro se, is therefore requesting the Court to dismiss the case against Mr. Dulac for these reasons, as are further detailed below.

## FACTUAL AND PROCEDURAL BACKGROUND

On behalf of FST and its 15 shareholder, Mr. Dulac has served as an officer, Managing Director and CEO of the Company, which has historically had an editorial team managing the content creation. Per the Amended and Restated Limited Liability LLC Agreement dated January 1, 2013 ("LLC Agreement"), Mr. Dulac agreed to accept the responsibilities of running the start-up in part knowing that he would be indemnified by FST for any threatened or actual suits, particularly cases such as this one, where parties are looking to pierce the corporate veil.

More specifically, in Section 5(f) "Indemnification", it states "[t]he Company shall indemnify and hold harmless any **person** or entity (an "Indemnified Person") **made**, or **threatened to be made**, a **party** to **an action or proceeding**, whether **civil**, criminal or investigative (a "Proceeding"), including an action by or in the right of the Company, by reason of the fact that such Indemnified Person was or is (a) the **Managing Director** (including without limitation tax matters partner), (b) an **Officer** of the Company, (c) any non-Member Affiliates of the Managing Director, (d) Member, or (e) an officer, director, shareholder, partner, member, employee, manager or agent of any of the foregoing, or by reason of the fact that such person or entity was or is serving at the request of the Company as a director, officer, employee, or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, **against all judgments, fines, amounts paid in settlement** and **reasonable expenses** (including investigation, accounting and attorneys' fees) incurred as a result of such **proceeding**,

or **any appeal therein** (and including, **without limitation, indemnification against active** or **passive negligence or breach of duty**)".  *[Emphasis Added]*

Section 5(f) further states that "[e]ach Indemnified Person shall have a **claim** against the **property** and **assets** of the Company for payment of any indemnity amounts from time to time due hereunder".  Moreover, "[t]he right to indemnification conferred in this Section 5 shall be a contract right and shall include the **right** to **require** the Company to **advance the expenses incurred by the Indemnified Person** in defending any such Proceeding **in advance** of its final disposition".  *[Emphasis Added]*

In Summer 2021, Plaintiff brought a lawsuit against FST and Mr. Dulac.  On December 31, 2021, FST filed for Chapter 11 bankruptcy under Subchapter V, which is meant to protect small businesses needing to restructure, particularly in light of COVID.  Plaintiff is listed as a creditor of the Company and never contested the $1,864.50 claim amount to the Bankruptcy Court.  Throughout the bankruptcy, Mr. Oppenheimer violated FST's automatic stay (§ 362 of the Bankruptcy Code) by proceeding and continuing with suit against the Company.   On February 7, 2023, FST emerged from Chapter 11 following confirmation from the Bankruptcy Court.   A copy of the Plan and the Confirmation Order are attached to the Declaration provided by Mr. Dulac in Exhibit A and Exhibit B respectively.

Per the Plan, Plaintiff is prohibited from (1) conducting and continuing any suit or (2) collecting any judgement or award **directly or indirectly** against **the Debtor** or the **assets of the Debtor**.  The Plan, Section 8.4 "Injunction", specifically states that "[e]ffective on the Effective Date, all creditors who have held, hold, or may hold Claims against the Debtor or its assets are enjoined from taking any of the following actions against the assets of the Debtor with respect to such Claims (other than actions brought to enforce any rights or obligations under the Plan or

appeals, if any, from the Confirmation Order): (i) **commencing, conducting** or **continuing** in **any manner, directly or indirectly, any suit, action** or **other proceeding of any kind** against the Debtor or the **assets of the Debtor;** (ii) **enforcing, levying, attaching, collecting** or otherwise **recovering by any manner** or **means** whether **directly** or **indirectly any judgment, award, decree** or order against the **Debtor** or **its assets;** (iii) **creating, perfecting** or otherwise **enforcing** in any manner, **directly or indirectly,** any **encumbrance** of any kind against the **Debtor** or the **assets** of the **Debtor;** (iv) asserting any set-off, right of subrogation or recoupment of any kind directly or indirectly against any obligation due the Debtor or its assets; and (v) proceeding in **any manner in any place** whatsoever that does not **conform** to or **comply** with the **provisions of the Plan.**" *[Emphasis added]*

The Confirmation Order further states in Section 7 that "[t]he discharge provisions contained in Section 8.1 and 8.2, and the injunction provision contained in Section 8.4, of the Amended Plan are deemed incorporated herein by reference, as if set forth herein in full, and are approved in all respects and shall be effective as provided for in the Amended Plan and sections 1192 of the Bankruptcy Code."

Further, the Confirmation Order states in Section 8 that "[t]he provisions of the confirmed Amended Plan **shall bind** the reorganized Debtor and **any creditor** or other party in interest, whether or not the claim or interest of such creditor or party in interest is impaired under the Amended Plan, and whether or not such creditor or party in interest has accepted the Amended Plan." Again, Mr. Oppenheimer is in fact a listed creditor in the bankruptcy, who in fact, never contested the unsecured claim amounts of $1,864.50 specified in the bankruptcy filing.

Following the emergence from bankruptcy and despite the Injunction, Plaintiff continues to seek damages from the FST and Mr. Dulac, who under the LLC Agreement, is fully indemnified, even in the case of "active or passive negligence or breach of duty" for any threatened or actual suit against him by the Debtor. If any judgement or rewards is made against Mr. Dulac, as an Indemnified Party, he "has claim against the property and assets of the Company for payment of any indemnity amounts from time to time due hereunder".

Moreover, Mr. Dulac has had to re-direct hundreds of hours away from re-building FST and delivering on the plan to creditors (one of which is the Plaintiff) to work on this suit. As the sole operator post-bankruptcy, every hour working on this case, is an hour away from working on the business and therefore irreparably harming the value of the Debtor's Estate. Mr. Dulac is also accumulating expenses working on this case, further impacting the Debtor's Estate. Finally, while Mr. Dulac has the contractual right to retain counsel and require FST to pay in advance legal fees, Mr. Dulac has held back to date to minimize the impact to Debtor and the Estate. Any such retainer, which typically starts at $10,000 and accumulates from there, would again irreparably harm the value of the Estate.

## BASIS FOR DISMISSAL

It is beyond argument, that Plaintiff has taken actions in violation of the Injunction by pursuing a suit against Mr. Dulac, who is fully indemnified by the Debtor. The Injunction prohibits creditors, such as the Plaintiff, from commencing, conducting, or continuing legal actions "directly or indirectly" against the Debtor or their assets or recovering any rewards or judgements against the Debtor or its Assets to help maintain the integrity of this bankruptcy

process and prevents actions that could hinder or complicate the resolution of the Debtor's financial situation, or worse, force the business into insolvency.

By continuing the suit against Mr. Dulac and seeking damages from such suit, Plaintiff is directly or at a minimum indirectly causing harm to the Debtor, its Estate, and its Assets. As noted above, Mr. Dulac, under the LLC Agreement is fully indemnified, even in the case of active or passive negligence or breach of duty for any threatened or actual suit against him by the Debtor. For clarity, neither active nor passive negligence or breach of duty has occurred by Mr. Dulac in this case.

In addition to the contractual obligations specified in the LLC agreement and bankruptcy documents there is further precedence in cases when non-Debtors are indemnified by the Debtor, its Estate and its Assets. In cases in which a claim against the non-debtor will have an immediate adverse economic impact on the estate, the automatic stay may be extended to non-debtors. See Queenie v. Nygard Int'l, 321 F.3d 282, 287-88 (2d Cir. 2003). Relying on A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir.), cert. denied, 479 U.S. 876 (1986), courts have extended the automatic stay to nonbankrupt codefendants in "unusual circumstances." As the case law demonstrates, courts have found "unusual circumstances" where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." Id. at 999 (relying on both the automatic stay provision and the bankruptcy court's equitable powers under 11 U.S.C. §(s) 105 to enjoin actions against nondebtor codefendants in the Dalkon Shield products liability litigation because of the potential impact on the estate and the availability of insurance proceeds to satisfy the claims); see also, In re American Film Technologies, Inc., 175 B.R. 847, 855 (Bankr.D.Del. 1994) (staying

prosecution of wrongful discharge claims against former and present directors of debtor corporation because of debtor's indemnification obligations and its possible exposure to collateral estoppel prejudice); In re Family Health Services, Inc., 105 B.R. 937, 942-43 (Bankr.C.D.Cal. 1989) (staying collection actions against nondebtor members of debtor HMO because judgments against nondebtors would trigger claims for indemnification from the debtor HMO).

    While any single action prohibited by the Injunction violates said Injunction and should serve as the basis for the dismissal of the case against Mr. Dulac, we detail several below. Section 8.4(b) of the Plan specifically prohibits Mr. Oppenheimer, a creditor, from enforcing, collecting or recovering in any matter or means **<u>directly</u>** or **<u>indirectly</u>** any judgment or award against the Debtor or its assets. This alone should be the basis for dismissal as any judgement or awards against Mr. Dulac would irreparably damage the Debtor, its Estate and its Assets. The Debtor runs a very small business, with currently less than $1,000 in the bank, which will lose money per the Plan in 2023 and cannot even afford to pay its CEO or any other employee in 2023. Plaintiff has specified in their initial complaint that they are seeking between $30,000 to $150,000 for each work infringed, plus legal fees and other expenses. Any judgement would clearly make FST insolvent.

    Section 8.4(a) prohibits conducting and continuing any lawsuit directly or indirectly against the Debtor, its Estate and its Assets. This clause is meant to protect against creditors, such as the Plaintiff, from taking legal action against the Debtor's Assets and to protect the Debtor's property and resources post-bankruptcy. Given that Mr. Dulac is indemnified by the Debtor and Debtor is contractually obligated to advance any suit related expense, legal or otherwise, to defend Mr. Dulac, a suit against Mr. Dulac is a suit against the Debtor, its Estate

and Assets. This violation is yet another basis for dismissal as Plaintiff's goal in conducting and continuing a suit against Mr. Dulac is to force a large payment or settlement, which the Debtor and its Estate is ultimately contractually responsible for. By continuing the suit against Mr. Dulac, the sole operator of business post-bankruptcy, Plaintiff continues to irreparably hurt the Debtor and its Estate as he is continuously pulled away from running the business on behalf of creditors and instead re-directed to spend hundreds of hours on this case. By ultimately continuing and conducting the suit against Mr. Dulac (and at the minimum indirectly against the indemnifying Debtor and Estate), Plaintiff is looking to get special treatment that all the other creditors as well as not providing the Debtor with the benefit of a fresh start or the finality to the bankruptcy process.

Section 8.4(c) of the Plan prohibits the Plaintiff from "creating ... directly or indirectly any encumbrance of any kind against the Debtor or the assets of the Debtor". With Section 5(f) on the LLC Agreement stated that "[e]ach Indemnified Person shall have a **claim** against the **property** and **assets** of the Company for payment of any indemnity amounts from time to time due hereunder", this suit against Mr. Dulac would create an "encumbrance against the Debtor or the assets of the Debtor". More specifically, any expenses already incurred by Mr. Dulac and any judgement, action or award against Mr. Dulac gives Mr. Dulac claims and creates encumbrances against the Debtor and its Estate, including its property and Assets. Again, this on its own is a basis for dismissal.

Section 8.4(e) prohibits Plaintiff from proceeding in **any manner in any place** whatsoever that does not **conform** to or **comply** with the **provisions of the Plan.** While I have already listed several areas, amongst others, where Plaintiff has not complied with the plan, it is worth noting, that Plaintiff never filed an objection to their total claimed amount as an unsecured

creditor. To now, request additional payments outside of this agreed to amount, is to ask for special treatment over other creditors.

Beyond the above specified in the Company's corporate and bankruptcy related documents and precedent cases with regards to indemnified non-debtors with regards to the automatic stay, there is additional cases that delve into discharge injunction when the non-debtor is indemnified by the Debtor. Courts in the First and Eighth Circuits have allowed third-party non-debtor releases when the factors outlined in In re Master Mortg. Fund, Inc. are balanced. *See In re Mahoney Hawkes, LLP, 289 B.R. 285, 299–303 (Bankr. D. Mass. 2002)* (adopting the Master Mortgage multi-factor test to determine necessity for non-debtor third-party injunctions) *(citing In re Master Mortg. Inv. Fund, Inc., 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994) ); In re U.S. Fidelis, Inc., 481 B.R. 503, 519 (Bankr. E.D. Mo. 2012); In re Midway Gold U.S., Inc., 575 B.R. 475, 503-05 (Bankr. D. Col. 2017)* (noting the same test was adopted in the First, Second, Fourth, Sixth, and Eleventh Circuits).

Those Master Mortgage five factors include when:

(1) There is an identity of interest between the debtor and the third-party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.

(2) The non-debtor has contributed substantial assets to the reorganization.

(3) The injunction is essential to reorganization. Without the it, there is little likelihood of success.

(4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment.

(5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

The U.S. Bankruptcy Court for the District of Delaware believes the Master Mortgage factors form the foundation for such an analysis, with additional consideration of other relevant factors, while the Third Circuit has not adopted a specific test for when such releases are appropriate. Per Master Mortgage, these factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness. *Master Mortgage, 168 B.R. at 935* (finding that there is no "rigid test" to be applied in every circumstance and that the five factors are neither exclusive, nor conjunctive). *In re Washington Mutual, Inc., 442 B.R. 314, 346–47 (Bankr. D. Del. 2011)* ("Determining the fairness of a plan which includes the release of nondebtors requires the consideration of numerous factors and the conclusion is often dictated by the specific facts of the case.") *(citing In re Continental Airlines, 203 F.3d at 212–14 ); see also In re Zenith Elecs. Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999)* (in considering debtor's release of third parties, court applied Master Mortgage five factor test).

The Non-Debtor is clearly one of these "unusual circumstances" and due consideration should be given to the overlapping factors described above and such a determination should be dictated by the specific facts of this case. More specifically, with regards to the five factors:

(1) There is a documented indemnity relationship between Mr. Dulac and the Debtor (including in cases of gross or passive negligence), such that a suit against the Non-Debtor is, in essence, a suit against the Debtor. The Debtor which has less than $1,000 currently in the bank, would have assets of the estate depleted from any judgement against Mr. Dulac. As noted previously, Plaintiff is seeking $30,000-$150,000 per infringed work, plus legal fees and other expenses.

(2) Mr. Dulac has not taken any salary from the Debtor since November 2020, since the bankruptcy proceeding and through the current re-organization to ensure a viable plan is in place to satisfy creditors. Mr. Dulac in fact loaned money to the business during COVID, invested in legal fees to retain bankruptcy counsel and ultimately was responsible for acquiring certain assets from the Debtor for $75,000, which enabled the company to emerge from bankruptcy. As noted in the Plan and other related documents, Mr. Dulac paid above and beyond the value of these design-related assets from FST to ensure professional and court-related fees were covered and to meet the Court's request to pay creditors $25,000 upfront. Mr. Dulac further secured a loan to the Debtor for additional monies to cover basic working capital. In order to minimize the burden of this loan to FST, he extended the loan repayment after the Plan was finalized in 2026 in order to ensure planned payments to creditors during the Plan. Furthermore, Mr. Dulac agreed to push back his preferred secured claims, which were due upfront and upon initial claim payment, to prioritize payment to other unsecured creditors over himself. Mr. Dulac has invested in and sacrificed a tremendous amount of time and money to the benefit of creditors, the Company, its Assets and its Estate.

(3) This injunction is essential to the reorganization. Without the injunction, there is little likelihood of success of the business and its creditor recovery. As mentioned, Debtor is currently wholly managed by Mr. Dulac upon emergence bankruptcy, to keep costs low, with Mr. Dulac currently not taking any salary, despite the burden this has put on him personally. This injunction is critical for several reasons. Firstly, Mr. Dulac has to defend himself pro se, because Debtor does not currently have the necessary financing, which it is contractually obligated to advance to Mr. Dulac to defend himself. Mr. Dulac

is not a lawyer and the work related to this case is taking up hundreds of hours of times, which Mr. Dulac should be spending on reviving the business to the benefit of creditors. This has already deeply harmed the estate and continues to every day. Since Mr. Dulac is the only current employee of the Company. Any time working on this case, means no one else is working on the business at that time. Secondly, any judgement of any amount against Mr. Dulac and therefore the Debtor would highly likely push the Debtor to insolvency and make it impossible to meet the obligations to creditors under the Plan.

(4) We have not had any creditor file a complaint against the injunction with the Bankruptcy Court and all claim objectives with creditors have been resolved. Given that the bankruptcy falls under Chapter 11 Subchapter V, which was enacted to protect small business, the Court ultimately confirms the plan if it meets certain requirements as opposed to a vote by creditors under a more traditional Chapter 11. The Plan was ultimately confirmed on February 7, 2023 when signed by the Honorable Judge Garrity. Plaintiff himself never objected to his claim amount to the Bankruptcy Court. We simply see Plaintiff's disregard of the Injunction generally and pursuing suit against Mr. Dulac specifically as a tactic to push for a settlement. This is after all, the same Plaintiff that blatantly ignored the automatic stay protection of the Debtor during the bankruptcy.

(5) We don't believe any claims, including any of the unsecured claims in the case, are affected by the existence of the injunction. In fact, the only way unsecured claimants will get impacted further at this point is if an injunction in not granted to Mr. Dulac, as the business can become insolvent or not provide creditors with the expected recovery under the Plan. Moreover, as stated above, that Plaintiff never objected to the claim amount of $1,864.50 noted in the bankruptcy petition (a de minimis 0.15% of the total claims),

despite having close to one year to do file a claim objection. In fact, Plaintiff's counsel

has mentioned on a status update call with the Honorable Judge Wood, that he would

provide support information to receive payment from Mr. Dulac personally to be made

whole on this amount and thereby Plaintiff would receive "payment of all, or

substantially all", of the claimed amount listed.

## CONCLUSION:

Currently only managed by Mr. Dulac, FST is a small company working very hard and in

a very lean manner to revive the business and execute on its plan on behalf of its creditors. After

earlier this year emerging from Chapter 11, Subchapter V, meant to protect small businesses,

Debtor now sees its solvency and ability to deliver on its plan to creditors put into jeopardy by

Plaintiff's case against Mr. Dulac. The time Mr. Dulac must spend on the case (and not execute

on the Plan) is currently devastating the business and the financial consequence of any damages

or awards would likely shut down the business and thereby irreparably damaging the Debtor, its

Assets and its Estate. The LLC agreement makes it contractually very clear that Mr. Dulac, both

an Officer and a Managing Director of FST, shall have a claim against FST's Estate (i.e. its

property and assets) from any damages pursuant to this lawsuit against Mr. Dulac, "including

without limitation, indemnification against active or passive negligence or breach of duty". In

addition to the language very clearly written in the LLC Agreement Section 5(f) and the Plan

Section 8.4, there is further precedence with regards to non-debtors treated as one and the same

as the Debtor and therefore receiving similar protection from the Discharge Injunction. While

only a guideline with regards to fairness, the Master Mortgage five factors do speak to (i) why

this injunction is essential for the company to survive, (ii) why any damages or judgement

against Mr. Dulac would deplete the Debtor and its Assets, (iii) how Mr. Dulac has contributed

above and beyond (cash investment, deferred compensation and loans) to ensure the Company's ability to deliver on the plan and to fund its emergence from bankruptcy, (iv) the fact that the Plan was confirmed by the Bankruptcy Court per Subchapter V criteria and (v) how the Plaintiff likely to be made substantially whole on their claimed amounts.

In light of all these factors and to insure Debtor's ability to successfully deliver on the Plan to creditors, any cases against Mr. Dulac should be dismissed and the discharge injunction enforced on his behalf.

Respectfully submitted.

Alexander Dulac, Pro Se

_____

Alexander Dulac
Defendant, Pro Se
Telephone: (646) 621-6269
Email: alex.dulac@gmail.com

THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| David Gordon Oppenheimer, | |
| Plaintiff, | Case No. 1:21-cv-02961 |
| v | Dist. Judge Andrea R. Wood |
| First Step Trademarks, LLC and Alexander C. Dulac | Mag. Judge Jeffrey T. Gilbert |
| Defendants. | |

**DECLARATION OF ALEXANDER C. DULAC**
**IN SUPPORT OF THE MOTION TO DISMISS FOR VIOLATION OF THE**
**DISCHARGE INJUCTION AGAINST ALEXANDER C. DULAC**

I, Alexander Dulac, of New York City, in New York, declare as follows:

1.     I am a defendant and represent myself, pro se, in connection with the above-captioned lawsuit.

2.     This Declaration is submitted in support of my motion to dismiss the case against Mr. Dulac ("Dulac") following the emergence from bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York ("Bankrupt Court") on February 7, 2023.

3.     Oppenheimer continues to pursue the suit against Mr. Dulac despite the discharge injunction from the Bankrupt Court.

4.     I included the amended plan of reorganization dated November 21, 2022 (the "Plan") in Exhibit A, with Section 8.4 summarizing the injunction in the case, and the order of confirmation dated February 7, 2023 (the "Confirmation Plan") in Exhibit B.

1

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted.

/s/ Alexander Dulac, Pro Se

Alexander Dulac

Defendant, Pro Se

Telephone: (646) 621-6269

Email: alex.dulac@gmail.com

# EXHIBIT A

**MCGRAIL & BENSINGER LLP**
888-C 8th Avenue #107
New York, New York 10019
Ilana Volkov, Esq.
Pearl Shah, Esq.
(201) 931-6910 (phone)
ivolkov@mcgrailbensinger.com

*Counsel for Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

In re:

FIRST STEP TRADEMARKS, LLC,

Debtor.
------------------------------------------------------- X

Chapter 11
Subchapter V
Case No.: 21-12147 (JLG)

### AMENDED PLAN OF REORGANIZATION FOR
### SMALL BUSINESS UNDER SUBCHAPTER V OF CHAPTER 11

First Step Trademarks, LLC, debtor and debtor in possession herein (the "Debtor"), hereby proposes the following Amended Plan of Reorganization for Small Business Under Subchapter V of Chapter 11 (the "Plan").

You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on the Plan.

Your rights may be affected by this Plan. You should consider discussing this document with an attorney.

### BACKGROUND[1]

#### A. Description and History of the Debtor's Business.

The Debtor is a Delaware limited liability company, which was founded by Alexander Dulac. Mr. Dulac owns approximately 65% of the Debtor's membership interests. The Debtor owns and operates a web-based business called The Plunge; its website is https://www.theplunge.com. The Plunge provides grooms with wedding-related information online including with respect to proposals, engagement rings, honeymoons, bachelor parties, attire,

---

[1] This Plan is for a small business debtor under Subchapter V of Chapter 11 of the Bankruptcy Code. Section 1190 of the Bankruptcy Code requires that such a plan include "(A) a brief history of the business operations of the debtor; (B) a liquidation analysis; and (C) projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization." The information in this section of this Plan is provided for that purpose.

and select wedding day responsibilities. The Plunge also launched an email system, customized to a couple's wedding date, and has layered in various tools to serve as a broader resource for grooms.

Originally founded in 2011, the Debtor's business kicked into full gear at the end of 2016 when it raised its first notable outside funds. Throughout the years, the Debtor secured outside investments and/or funding in the total amount of $2,362,500. The proceeds of these capital raises were used to build out the Company's core media assets (including content, email and tools), design a wedding band business and fund general operating expenses.

The latest investment closed during the summer of 2019, for a total of $992,500. This latest fund raise allowed the Debtor to target its efforts on making The Plunge a more complete, all-in resource for grooms in key categories, with deeper dives into travel, jewelry, fashion, proposals, gifting, wedding planning, and finances, and to add more value to grooms and brides who signed-up for emails or who were googling for relevant content. In turn, this significant growth in content enabled the Debtor to redirect its time and resources to rebuilding its custom email system, which then served as a platform for distributing its newly created content.

During this time, the Debtor also started constructing two other tools, including a custom quiz and playbook to learn more about its audience and to serve as a lead magnet, and a "who's coming to the wedding" tool. Although all the designs, illustrations and majority of the coding was completed for these tools by March 2020, the Debtor decided at the onset of the COVID-19 pandemic to prioritize its limited financial resources on completing the email system and going live with previously written content, tabling those other key tools until weddings fully resumed. Going into the pandemic, the Debtor also completed the branding and designs for a direct-to-consumer wedding band business and had worked on the design of a wedding-related mobile application.

After the Debtor launched the core media assets, it planned to turn its attention to monetizing them ahead of summer and fall 2020 weddings. The Debtor also planned to leverage the website to drive traffic to its wedding band business.

Unfortunately, with the onset of the global COVID-19 pandemic, those plans were placed abruptly on hold. The pandemic devastated the wedding industry, as most weddings were cancelled, rescheduled or significantly reduced in budget for more than 15 months. Moreover, the pandemic created material day-to-day uncertainty and lack of visibility as to when weddings would resume to pre-pandemic levels for the vast majority of the country. Accordingly, the Debtor's business was placed on hold pending a clearer and more certain path to the return of weddings.

**B. The Debtor's Chapter 11 Bankruptcy Filing.**

The Debtor filed its Chapter 11 bankruptcy petition on December 31, 2021 (the "Petition Date"). The Debtor's financial difficulties were exacerbated by the onset of the global COVID-19 pandemic, which had a particularly devastating effect on the wedding industry. As a result of the pandemic, most weddings were cancelled, rescheduled, or significantly reduced in budget for more than 15 months.

In addition, one investor group holding a convertible promissory note in the principal amount of $600,000 (i) threatened litigation starting in October 2020 unless repaid immediately and, ultimately, (ii) sued the Debtor for repayment of the note in September 2022. This litigation overhang severely impeded the Debtor's ability to obtain much needed new capital in time for the resumption of the wedding business and to capitalize on the significant investments theretofore made.

**C. The Debtor's Assets.**

The Debtor estimates the book value of its assets as of the Petition Date to be $351,000. Those assets consist primarily of intellectual property and good will.

**D. The Debtor's Liabilities.**

The total of scheduled claims and proofs of claim filed is $2.59 million; however, there is an overlap between the proofs of claim and the scheduled amounts to the extent of approximately $758 thousand. Accordingly, the Debtor estimates its general unsecured liabilities to total approximately $1.3 million.

The Debtor has examined all proofs of claim which have been filed in this case and plans to object to the following unsecured claims, which do not comport with its books and records:

| Creditor | Scheduled Claim Amount | Proofs of Claim Amount | Objection Amount/Dispute | Reason |
|----------|------------------------|------------------------|--------------------------|--------|
| Ward Mooney | $0 | $100,000 | $100,000 | Objecting as noteholder automatically converted to common stock |
| Rebel Capital, LLC | $0 | $100,000 | $100,000 | Objecting as noteholder automatically converted to common stock |
| Christopher Donnelly | $0 | $20,000 | $20,000 | Objecting as noteholder automatically converted to common stock |
| Plunge Group 2019 LLC | $0 | $241,920 | $241,920 | Objecting as noteholder automatically converted to common stock |

| Nico Trinkhaus | $0 | $30,864.02 | $30,864.02 | Does not comport with books and records. |
|---|---|---|---|---|
| Strand Studio LLC | $5,000 | $10,000 | $5,000 | Included Strand Studio on Scheduled Claims, but its principal Lacey Waterman filed duplicate claim. |
| Department of Labor | $10,416 | $24,019.21 | $13,603.21 | Included Jake Masucci on Scheduled Claims, but Department of Labor filed duplicate claim. |
| **Total** | | $526,803.23 | $511,387.23 | |

### E. Liquidation Analysis.

To confirm this Plan, the Court must find that all creditors who do not accept this Plan will receive at least as much under this Plan as such claim holder would receive in a chapter 7 liquidation. For purposes of demonstrating this requirement, the Debtor has prepared a liquidation analysis attached hereto as Exhibit A. The liquidation analysis does not include any avoidance actions as the Debtor is not aware of the existence of any such actions. The liquidation analysis shows that if the Plan is not confirmed and the Debtor's case is converted to chapter 7 as a result, creditors will receive no distribution.

### F. Ability to Make Future Plan Payments and Operate Without Further Reorganization.

The Debtor also must show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the Debtor's business. For purposes of demonstrating this requirement, the Debtor has prepared projected financial information attached hereto as Exhibit B (the "Cash Flow Projections"), which reflects that the Debtor will have projected disposable income (as defined by § 1191(d) of the Bankruptcy Code) for three years to make distributions to holders of Allowed Claims.

## ARTICLE I
## SUMMARY

The Plan proposes to pay creditors of the Debtor from funds generated by the Debtor's operations as a going concern.

The Plan provides for:      One (1) class of (non-tax) priority claims
One (1) class of general unsecured claims;
One (1) class of Equity Interests; and
One (1) class of Options.

The Plan provides for the full payment of Allowed priority claims in accordance with the Bankruptcy Code. General unsecured creditors holding Allowed Claims will receive the Initial Unsecured Creditor Payment (as defined below) and distributions of the Debtor's projected disposable income for the years ended 2023, 2024 and 2025, as set forth in Exhibit B over a period of three (3) years from the Effective Date. The Debtor reasonably estimates that the total recovery to holders of Allowed General Unsecured Claims will be approximately eighteen percent (18%), but the actual distribution(s) percentage will depend on the total final Allowed General Unsecured Claims and potential post-confirmation costs should the Plan be confirmed nonconsensually under §1191(b).[2] The Plan further provides for the continued retention of Equity Interests and the cancellation of Options.

All creditors should refer to Articles III through VI of the Plan for information regarding the precise treatment of their claim.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTEREST

**2.1    Class 1 Claims – (Non-Tax) Priority Claims.**

Class 1 Claims consist of the Allowed Claim of Alexander Dulac for services rendered to the Debtor within 180 days before the Petition Date.

**2.2    Class 2 Claims – Unsecured Claims.**

Class 2 Claims consist of Allowed General Unsecured Claims.

**2.3    Class 3 Interests – Equity Interests.**

Class 3 consists of Membership Interests in the Debtor.

---

[2] Potential post-confirmation costs may include the cost of procuring a bond for the Subchapter V Trustee and her services rendered as Disbursing Agent. The Subchapter V Trustee will be compensated at her applicable billing rate, which may be adjusted annually. Her 2022 billing rate is $575 an hour.

**2.4    Class 4 Interests – Options.**

Class 4 consists of Options.

**ARTICLE III**
**TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS,**
**AND COURT FEES**

**3.1    Unclassified Claims.**

Pursuant to § 1123 of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified.

**3.2    Administrative Expense Claims.**

Each holder of an Allowed Administrative Expense Claim will be paid in full on the later of (i) the Effective Date of the Plan or (ii) thirty (30) days after such Claim becomes Allowed, or upon such other terms as may be agreed upon by the holder of the Claim and the Debtor.[3] The estimated Administrative Expense Claims through the date of the filing of this Plan are as follows:

| Name | Title | Amount |
|------|-------|--------|
| McGrail & Bensinger LLP | Counsel to Debtor | $75,000[4] |
| Jolene Wee | Subchapter V Trustee | $10,000 |

**3.3    Priority Tax Claims**

Secured and priority tax claims have been asserted by the New York Department of Taxation ("NYDT") in the total approximate amount of $1,000. Based on discussions the Debtor has had with the NYDT, the Debtor reasonably believes that the NYDT will agree to reclassify those claims to General Unsecured Claims.  To the extent an agreement cannot be reached, the Plan provides for payment in full of said tax claims on the later of the Allowance of the Claim or thirty (30) days of the Effective Date.

**3.4    Statutory Fees**

N/A.

---

[3] Mr. Dulac has not received any reimbursement for services rendered to the Debtor since the Petition Date.  He believes he holds an Administrative Claim for unpaid monthly reimbursements for the period January 1, 2022, to the Effective Date.  Said claim will be paid starting in 2026 after, and conditioned upon, the funding of the final payment to holders of Allowed General Unsecured Claims of the Reorganized Debtor's disposable income for the year 2025.  His agreement to defer payment of his Administrative Claim applies only in the event the Plan is confirmed; in the event the Plan is not confirmed and this case is converted to Chapter 7, Mr. Dulac advises he does not agree to the deferment/subordination of his Administrative Claim.

[4] This amount includes the retainer of $21,096.50 being held by Debtor's counsel; fees and expenses will continue to accrue through the Effective Date of the Plan.

**ARTICLE IV**
**TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

4.1    Claims and interests shall be treated as follows under the Plan:

| Class | Impairment | Scheduled Amount | Treatment |
|---|---|---|---|
| Class 1 – Priority Non-Tax Claims | Impaired | $60,000 (subject to a cap of $13,650) | Class 1 consists of the Allowed Priority Non-Tax Claim of Alexander Dulac. In full satisfaction of this Allowed Priority Claim, Mr. Dulac will receive the sum of $6,825 in 2024 and $6,825 in 2025. The balance of the Allowed Priority Claim will be included in Class 2.<br><br>Class 1 Claims is impaired and, therefore, entitled to vote on the Plan.  However, because the Class 1 creditor is an "insider" and his vote does not count, he will not receive a ballot. |
| Class 2 – Unsecured Claims | Impaired | $1,289,907.67[5] | Class 2 consists of Allowed General Unsecured Claims. In full satisfaction of its Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim will receive a Pro Rata distribution of: (i) within the later of thirty (30) days of the Effective Date or Allowance of the Claim, the sum of $25,000 (the "Initial Unsecured Creditor Payment"); and, thereafter, (ii) the Debtor's projected disposable income for three (3) years as set forth in Exhibit B: for the year 2023, the estimated amount of **$19,435** will be made by January 31, 2024; for the year 2024, the estimated amount of **$65,065** will be made by January 31, 2025; and for the year 2025, the estimated amount of **$123,620** will be made by January 31, 2026, for a total approximate Pro Rata distribution of approximately eighteen (18) percent.[6] |

---

[5] The total Allowed amount of General Unsecured Claims may be affected by the claim objections brought by the Debtor and the Court's adjudication thereof.

[6] The actual distribution(s) percentage to holders of Allowed General Unsecured Claims will depend upon the pool of total Allowed General Unsecured Claims.

| Class 3 – Equity Interests | Unimpaired | N/A | Class 3 consists of Allowed Equity Interests. Upon the Effective Date of the Plan, each holder of an Allowed Equity Interest shall retain such Interests.<br><br>Class 3 Interests are unimpaired and, therefore, holders of Class 3 Equity Interests are deemed to have accepted the Plan. |
| Class 4 – Options | Impaired | N/A | Class 4 consists of Options. Upon the Effective Date of the Plan, all Options will be cancelled.<br><br>Class 4 Interests are impaired; because Class 4 will receive no distribution under the Plan, Class 4 is presumed to have rejected the Plan. |

## ARTICLE V
## ALLOWANCE AND DISALLOWANCE OF CLAIMS

### 5.1    Objections to Claims.

The Debtor may continue to prosecute any objection to any claim filed prior to confirmation of the Plan after the Effective Date. Any Claim subject to an objection which has not been adjudicated by Final Order or otherwise resolved prior to Confirmation will be treated as a Disputed Claim under the Plan. Any objections to Claims shall be filed by the Debtor no later than one hundred and twenty (120) days after the Effective Date, which deadline may be extended by the Court upon application or motion of the Debtor without notice filed prior to the deadline. In the event that any proof of claim is filed, asserted or amended after the Effective Date, the Debtor shall have one hundred twenty (120) days from the date of such filing or notice to object to such claim, which deadline may be extended by the Court upon application or motion of the Debtor without notice filed prior to the deadline. All objections shall be litigated (or settled) to Final Order. The Bankruptcy Court shall retain jurisdiction to adjudicate any and all objections to claims whether filed prior to or after the Effective Date.

### 5.2    Disputed Claim Reserve.

No distribution will be made on account of a Disputed Claim unless such Claim is Allowed. On any date that distributions are to be made under the terms of this Plan, the Disbursing Agent shall deposit in one or more accounts (either an attorney escrow account or a segregated account with a banking institution that is a depository authorized by the United States Trustee for bankruptcy cases in the Southern District of New York), cash equal to 100% of the cash that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto, including, but not limited to (i) Disputed Claims that may be entitled to treatment as administrative expenses or as priority claims pursuant to §§ 503 and 507 of the Bankruptcy

8

Code, (ii) claims of governmental units for any tax and (iii) any amount due but not payable on the Effective Date on account of administrative expenses or claims entitled to priority pursuant to §§ 503 and 507 of the Bankruptcy Code. The Disbursing Agent shall also segregate any interest, dividends or proceeds of such cash. Such cash together with any interest, dividends or proceeds thereof, SHALL be held in trust for the benefit of the holders of all such Disputed Claims pending determination of their entitlement thereto. Within fourteen (14) days after the entry of a Final Order resolving an objection to a Disputed Claim, the Disbursing Agent shall distribute all cash, including any interest, dividends or proceeds thereof, to which a holder is then entitled with respect to any Disputed Claim that has become an Allowed Claim.

## ARTICLE VI
## MEANS FOR IMPLEMENTATION OF THE PLAN

### 6.1    Funding of the Plan.

On the Effective Date, the Debtor will have entered into an asset purchase agreement or similar document of conveyance with One Road Home, Inc., a newly formed entity ("ORH"), pursuant to which the Debtor will sell and transfer to ORH, and ORH will buy from the Debtor, the Wedding Band Assets and the Planning App Graphics  for the sum of $75,000 (the "Purchase Price").[7] Additionally, on the Effective Date, ORH will provide the Reorganized Debtor with a drawdown loan facility in the total amount of $12,500 (the "Loan"), the proceeds of which will be used to fund go forward business operations as set forth in the Cash Flow Projections. The proceeds of the Purchase Price will be used to fund (a) payments to Allowed Priority Tax Claims and Allowed Administrative Expense Claims as well as (b) the Initial Unsecured Creditor Payment.

Additionally, on the Effective Date, the Debtor and ORH will enter into one or more Service Agreements/Media Agreements pursuant to which ORH will pay the Debtor to run ads on The Plunge platform.  The anticipated revenue the Reorganized Debtor will receive from these agreements is reflected in the Cash Flow Projections.

One Road ("OR"), which is distinct in name from The Plunge, will be selling men's wedding bands directly to consumers through its own website. Every year, there are approximately two million weddings in the U.S. (absent the COVID timeframe), with the vast majority of men buying a wedding band. The Plunge, and other strategic outlets developed exclusively by Mr. Dulac, will drive traffic to OR's website. OR will advertise its business on The Plunge and pay advertising money to the Debtor in exchange. OR's fixed, contractual relationship with the Debtor is significantly more beneficial to the Debtor than the more typical automated programmatic advertising where brands generally bid on an exchange for advertising on the site at commoditized levels (wherein The Plunge would receive only about $1,000 per month in revenue given its very niche, sub-scale audience). ORH plans to soft launch the wedding band business

---

[7]  The graphic designs, product samples, branding, and packaging that have been developed to date for the wedding band and planning app business have little or no inherent value; accordingly, the Purchase Price is a reflection more of the funds necessary to confirm the Plan than the actual value (if any) of these assets.

approximately four months after the Effective Date and to hard launch three months thereafter when it plans to market on The Plunge more comprehensively.

Once the wedding band business is inaugurated, ORH will focus on launching the Planning App, which will also be distinct in name from The Plunge. The Planning App is still in its early stages of development, having only preliminary graphic designs. However, Mr. Dulac has identified talented partners to work with to develop this business. Mr. Dulac anticipates that the Planning App will have a soft launch in the fourth quarter of 2023 and a hard launch in the first quarter of 2024. The Planning App will be marketed across multiple distribution channels, including on The Plunge. The Planning App will pay The Plunge advertising dollars pursuant to a contractual relationship in exchange for traffic and leads. It is anticipated that the Planning App will generate income from advertising and partnerships in the travel business, as well as from other sources; in turn, from this revenue, the Planning App will be able to comply with its contractual arrangement with The Plunge.

Finally, going into 2024, with both the Wedding Band business and the Planning App launched, The Plunge plans to partner with other companies seeking to reach The Plunge audience, across other verticals, namely in suiting, honeymoons and other decision grooms are involved in. Mr. Dulac will be leading this partnership effort and will have the benefit of the full year of 2023 to finalize these partnerships.

The distributions that are to be made on and after the Effective Date under this Plan shall be funded from the Purchase Price and the Reorganized Debtor's business operations. In the event the Court approves this Plan as a consensual Plan, then the Reorganized Debtor shall be the Disbursing Agent responsible for making any and all post-Confirmation payments that are required under the Plan. In the event the Court approves this Plan by cramdown, the Debtor proposes the Subchapter V Trustee to serve as the Disbursing Agent.

## 6.2    Post-Confirmation Management.

The Debtor's post-confirmation operations will continue to be managed by Alexander Dulac. Mr. Dulac's compensation shall consist of $3,000 in salary in 2023, $60,000 in 2024 and $75,000 in 2025, all as reflected more specifically in the Cash Flow Projections.

Mr. Dulac also will have an ownership and management role in ORH. On the Effective Date, he will own 100% of ORH's membership interest, which will be subject to dilution as a result of the conversion of SAFE notes issued to current and prospective investors. He will be ORH's CEO.

## ARTICLE VII
## GENERAL PROVISIONS

**7.1     Definitions and Rules of Construction.**

The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan, and they are supplemented by the following definitions:

(i)      "Administrative Expense Claim" means any cost or expense of administration of the Chapter 11 case entitled to priority under Section 507(a)(2) of the Code and allowed under Section 503(b) of the Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the Petition Date, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Subchapter V Trustee for fees and/or reimbursements, and any fees or charges assessed against the Debtor's estate under Chapter 123, Title 28, United States Code (which is not applicable in a Subchapter V case).

(ii)     "Allowance" means when a Claim becomes an Allowed Claim.

(iii)    "Allowed" or "Allowed Claim" means any Claim or Interest against the Debtor that is scheduled by or on behalf of the Debtor as not disputed, contingent or unliquidated, or proof or request for payment of which has been filed timely with the Bankruptcy Court and, in either case, a Claim (a) as to which no objection has been interposed within one hundred twenty (120) days after the Effective Date or (b) as to which an objection has been interposed and such Claim has been allowed by a Final Order of the Bankruptcy Court.

(iv)     "Bankruptcy Code" means title 11 of the United States Code (11 U. S.C. §§ 1101, *et seq.*).

(v)      "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as in effect on the Filing Date and as amended after the Filing Date and during the Debtor's chapter 11 case.

(vi)     "Claim" means any right to payment from the Debtor and/or any or all of the Released Parties arising, or with respect to which the obligation giving rise to such right has been incurred, before the Effective Date of this Plan, and based upon, concerning, relating to, or in any manner arising from, in whole or in part, the Debtor and/or the Debtor's operations, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or any right to an equitable remedy for breach of performance arising, or with respect to which the obligation giving rise to such right has been incurred, before the Effective Date, if such breach gives rise to a right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

11

unsecured. FOR THE AVOIDANCE OF DOUBT, "CLAIM" SHALL SPECIFICALLY AND EXPRESSLY INCLUDE ALL CLAIMS UNDER FEDERAL, STATE AND/OR LOCAL LAW OR REGULATION.

(vii)    "Confirmation Date" means the date on which the Court enters the Confirmation Order.

(viii)    "Confirmation Order" means an order of the Bankruptcy Court confirming the Plan.

(ix)    "Disputed Claim" means (a) any Claim that is listed in the Schedules as disputed, contingent or unliquidated and with respect to which no Proof of Claim has been filed; and (b) any Claim, or portion thereof, that has not been disallowed and with respect to which an objection or action concerning the allowance and/or extent thereof, in whole or in part, has been interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, to the extent that any such objection or action has not been resolved by a Final Order.

(x)    "Debtor's Professionals" means such attorneys, accountants and/or other professionals employed by the Debtor in connection with this case.

(xi)    "Disbursing Agent" means, if a consensual Plan, the Reorganized Debtor; if a nonconsensual Plan, the Subchapter V Trustee.

(xii)    "Effective Date" means the first business day following the date that is fourteen (14) days after the entry of the order confirming this Plan. If, however, a stay of the confirmation order is in effect on that date, the Effective Date will be the first business day after the date on which the stay expires or is otherwise terminated.

(xiii)    "Equity Interest" means a membership unit in the Debtor.

(xiv)    "Final Order" means an order of a court as to which (a) any appeal that has been taken has been determined finally or dismissed or (b) the time for appeal has expired and (i) no timely appeal has been filed and (ii) no order having the effect of tolling or otherwise extending the appeal period is in effect.

(xv)    "General Unsecured Claim" means any Claim that is not an Administrative Expense Claim, a Priority Non-Tax Claim or a Priority Tax Claim.

(xvi)    "Options" means the option to buy Equity Interests.

(xvii)    "Planning App" means an application downloadable by users to their mobile devices in order to help with planning and organizing group events.

(xviii)    "Planning App Graphics" means preliminary graphic designs and related intellectual property for the Planning App.

12

(xix)    "Priority Non-Tax Claim" means any Claim entitled to priority in payment under Section 507(a)(4) and (a)(5) of the Bankruptcy Code.

(xx)    "Priority Tax Claim" means any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

(xxi)    "Pro    Rata"    means,    with    respect    to    any    Allowed    Claim,    the proportions that such Allowed Claim bears to the aggregate amount of all claims in such class.

(xxii)    "Reorganized Debtor" means the Debtor in its post-Confirmation Order state.

(xxiii)    "Wedding Band Assets" means all assets related to Debtor's wedding band business:

- o    All domain names related to OneRoad, including oneroadbands.com;
- o    All social media handles related to OneRoad;
- o    All registered and non-registered trademarks for OneRoad, as used and/or registered in or outside the United States;
- o    All packaging designs and samples, including the packaging system, sample box, final ring box and collateral;
- o    All digital wedding band designs;
- o    All physical samples of wedding bands;
- o    All website graphic designs;
- o    All brand books and related materials;
- o    All writing books and related materials; and
- o    Any and all other documents and intellectual property related to the wedding band business.

**7.2    Authority to Effectuate the Plan.**

Upon the Confirmation Order becoming a Final Order, all matters provided under the Plan shall be deemed to be authorized and approved without the requirement of further approval from the Bankruptcy Court or the Debtor. The Debtor shall be authorized, without further application to or order of the Bankruptcy Court to take whatever action necessary to achieve consummation and carry out the Plan and to effectuate the transactions provided for thereunder.

**7.3    Revesting of Assets.**

Consistent with §§ 1123(a)(5)(A) and 1141 of the Bankruptcy Code, except for the Wedding Band Assets and Planning App Graphics, title to all assets and property of the estate of the Debtor shall pass to, and vest in, the Reorganized Debtor free and clear of all Claims, Liens, charges and other rights of creditors arising prior to the Effective Date. On and after the Effective Date, the Reorganized Debtor may conduct its financial affairs and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court, except as otherwise provided in this Plan or in the Confirmation Order. Any distribution check that

THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

David Gordon Oppenheimer,

              Plaintiff,

         v

First Step Trademarks, LLC and Alexander C.
Dulac

              Defendants.

Case No. 1:21-cv-02961

Dist. Judge Andrea R. Wood

Mag. Judge Jeffrey T. Gilbert

## MOTION TO DISMISSAL AGAINST MR. DULAC
## FOR VIOLATION OF THE DISCHARGE INJUNCTION

      Alexander Dulac ("Dulac" or "Non-Debtor"), pro se, and officer of First Step

Trademarks, LLC ("FST", "Debtor" or "Company") respectfully submits this motion to dismiss

the suit by Plaintiff, David Gordon Oppenheimer ("Plaintiff" or "Oppenheimer") (together "the

Motion").

### PRELIMINARY STATEMENT

      FST entered into Chapter 11 bankruptcy in the United States Bankruptcy Court for the

Southern District of New York ("Bankruptcy Court") on December 31, 2022 and emerged from

bankruptcy on February 7, 2023. The Court in Illinois was provided notice of the bankruptcy by

FST's bankruptcy counsel on January 11, 2022 and the Plaintiff, who is one of the listed

creditors, has been receiving all bankruptcy notices, which have been sent to his attorney Ilya

Zlatkin. Despite numerous warnings, Plaintiff and his counsel, Ilya Zlatkin, continue to willfully

violate the automatic stay, pursuant to Section 362(a) of the Bankruptcy Code, protecting the

Debtor during the proceedings and now post-discharge in an attempt to force a settlement.

Beyond pursuing the suit against FST, Mr. Oppenheimer continues to pursue a suit against Mr. Dulac, an officer, and a Managing Director of FST, in an attempt to pierce the corporate veil with Plaintiff previously stating that "Oppenheimer would be able to pierce FST's corporate veil to access Dulac's (i.e., the non-debtor's) assets, if Oppenheimer prevailed on his claims in this case." As Plaintiff is aware, Mr. Dulac is indemnified by the Company and therefore any damages or settlement would directly harm the estate of the Debtor ("Estate"). More specifically, per FST's LLC Agreement, Mr. Dulac is fully indemnified by FST against any lawsuits "including without limitation, indemnification against active or passive negligence, or breach of duty". As an indemnified party, Mr. Dulac has "claim against the **property and assets** of the **Company** for payment of any indemnity amounts" amongst other rights, which also impact the Debtor, its Estate and its Asset. The amended plan of reorganization dated November 21, 2022 (the "Plan"), confirmed on February 7, 2023 and signed by Judge James L. Garrity, Jr from the Bankruptcy Court (the "Confirmation Order), issued an injunction prohibiting Plaintiff from (1) conducting and continuing any suit or (2) collecting any judgement or award **directly or indirectly** against the Debtor or the **assets of the Debtor**. The (1) conducting and continuation of this suit against Mr. Dulac, which pre-dates the bankruptcy filing and continues to take hundreds of hours away from running the business on behalf of creditors, and (2) any related judgement or awards against Mr. Dulac (where Plaintiff is seeking in his initial complaint between $30,000 and $150,000 for any act of infringement, plus fees and legal expenses per their initial complaint) is in violation of the Bankruptcy Court discharge injunction ("Injunction"). Beyond irreparably hurting the Debtor, its Assets and Estate, any damages or awards would lead to insolvency.

Defendant Dulac, pro se, is therefore requesting the Court to dismiss the case against Mr. Dulac for these reasons, as are further detailed below.

## FACTUAL AND PROCEDURAL BACKGROUND

On behalf of FST and its 15 shareholder, Mr. Dulac has served as an officer, Managing Director and CEO of the Company, which has historically had an editorial team managing the content creation.   Per the Amended and Restated Limited Liability LLC Agreement dated January 1, 2013 ("LLC Agreement"), Mr. Dulac agreed to accept the responsibilities of running the start-up in part knowing that he would be indemnified by FST for any threatened or actual suits, particularly cases such as this one, where parties are looking to pierce the corporate veil.

More specifically, in Section 5(f) "Indemnification", it states "[t]he Company shall indemnify and hold harmless any **person** or entity (an "Indemnified Person") **made**, or **threatened to be made**, a **party** to **an action or proceeding**, whether **civil**, criminal or investigative (a "Proceeding"), including an action by or in the right of the Company, by reason of the fact that such Indemnified Person was or is (a) the **Managing Director** (including without limitation tax matters partner), (b) an **Officer** of the Company, (c) any non-Member Affiliates of the Managing Director, (d) Member, or (e) an officer, director, shareholder, partner, member, employee, manager or agent of any of the foregoing, or by reason of the fact that such person or entity was or is serving at the request of the Company as a director, officer, employee, or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, **against all judgments, fines, amounts paid in settlement** and **reasonable expenses** (including investigation, accounting and attorneys' fees) incurred as a result of such **proceeding**,

or **any appeal therein** (and including, **without limitation, indemnification against active** or **passive negligence or breach of duty**)". *[Emphasis Added]*

    Section 5(f) further states that "[e]ach Indemnified Person shall have a **claim** against the **property** and **assets** of the Company for payment of any indemnity amounts from time to time due hereunder". Moreover, "[t]he right to indemnification conferred in this Section 5 shall be a contract right and shall include the **right** to **require** the Company to **advance the expenses incurred by the Indemnified Person** in defending any such Proceeding **in advance** of its final disposition". *[Emphasis Added]*

    In Summer 2021, Plaintiff brought a lawsuit against FST and Mr. Dulac. On December 31, 2021, FST filed for Chapter 11 bankruptcy under Subchapter V, which is meant to protect small businesses needing to restructure, particularly in light of COVID. Plaintiff is listed as a creditor of the Company and never contested the $1,864.50 claim amount to the Bankruptcy Court. Throughout the bankruptcy, Mr. Oppenheimer violated FST's automatic stay (§ 362 of the Bankruptcy Code) by proceeding and continuing with suit against the Company. On February 7, 2023, FST emerged from Chapter 11 following confirmation from the Bankruptcy Court. A copy of the Plan and the Confirmation Order are attached to the Declaration provided by Mr. Dulac in Exhibit A and Exhibit B respectively.

    Per the Plan, Plaintiff is prohibited from (1) conducting and continuing any suit or (2) collecting any judgement or award **directly or indirectly** against **the Debtor** or the **assets of the Debtor**. The Plan, Section 8.4 "Injunction", specifically states that "[e]ffective on the Effective Date, all creditors who have held, hold, or may hold Claims against the Debtor or its assets are enjoined from taking any of the following actions against the assets of the Debtor with respect to such Claims (other than actions brought to enforce any rights or obligations under the Plan or

appeals, if any, from the Confirmation Order): (i) **commencing, conducting** or **continuing in any manner, directly or indirectly, any suit, action** or **other proceeding of any kind** against the **Debtor** or the **assets of the Debtor;** (ii) **enforcing, levying, attaching, collecting** or otherwise **recovering by any manner** or **means** whether **directly** or **indirectly any judgment, award, decree** or order against the **Debtor** or **its assets**; (iii) **creating, perfecting** or otherwise **enforcing** in any manner, **directly or indirectly,** any **encumbrance** of any kind against the **Debtor** or the **assets** of the **Debtor;** (iv) asserting any set-off, right of subrogation or recoupment of any kind directly or indirectly against any obligation due the Debtor or its assets; and (v) proceeding in **any manner in any place** whatsoever that does not **conform** to or **comply** with the **provisions of the Plan**." *[Emphasis added]*

The Confirmation Order further states in Section 7 that "[t]he discharge provisions contained in Section 8.1 and 8.2, and the injunction provision contained in Section 8.4, of the Amended Plan are deemed incorporated herein by reference, as if set forth herein in full, and are approved in all respects and shall be effective as provided for in the Amended Plan and sections 1192 of the Bankruptcy Code."

Further, the Confirmation Order states in Section 8 that "[t]he provisions of the confirmed Amended Plan **shall bind** the reorganized Debtor and **any creditor** or other party in interest, whether or not the claim or interest of such creditor or party in interest is impaired under the Amended Plan, and whether or not such creditor or party in interest has accepted the Amended Plan."  Again, Mr. Oppenheimer is in fact a listed creditor in the bankruptcy, who in fact, never contested the unsecured claim amounts of $1,864.50 specified in the bankruptcy filing.

Following the emergence from bankruptcy and despite the Injunction, Plaintiff continues to seek damages from the FST and Mr. Dulac, who under the LLC Agreement, is fully indemnified, even in the case of "active or passive negligence or breach of duty" for any threatened or actual suit against him by the Debtor. If any judgement or rewards is made against Mr. Dulac, as an Indemnified Party, he "has claim against the property and assets of the Company for payment of any indemnity amounts from time to time due hereunder".

Moreover, Mr. Dulac has had to re-direct hundreds of hours away from re-building FST and delivering on the plan to creditors (one of which is the Plaintiff) to work on this suit. As the sole operator post-bankruptcy, every hour working on this case, is an hour away from working on the business and therefore irreparably harming the value of the Debtor's Estate. Mr. Dulac is also accumulating expenses working on this case, further impacting the Debtor's Estate. Finally, while Mr. Dulac has the contractual right to retain counsel and require FST to pay in advance legal fees, Mr. Dulac has held back to date to minimize the impact to Debtor and the Estate. Any such retainer, which typically starts at $10,000 and accumulates from there, would again irreparably harm the value of the Estate.

## BASIS FOR DISMISSAL

It is beyond argument, that Plaintiff has taken actions in violation of the Injunction by pursuing a suit against Mr. Dulac, who is fully indemnified by the Debtor. The Injunction prohibits creditors, such as the Plaintiff, from commencing, conducting, or continuing legal actions "directly or indirectly" against the Debtor or their assets or recovering any rewards or judgements against the Debtor or its Assets to help maintain the integrity of this bankruptcy

process and prevents actions that could hinder or complicate the resolution of the Debtor's financial situation, or worse, force the business into insolvency.

By continuing the suit against Mr. Dulac and seeking damages from such suit, Plaintiff is directly or at a minimum indirectly causing harm to the Debtor, its Estate, and its Assets. As noted above, Mr. Dulac, under the LLC Agreement is fully indemnified, even in the case of active or passive negligence or breach of duty for any threatened or actual suit against him by the Debtor. For clarity, neither active nor passive negligence or breach of duty has occurred by Mr. Dulac in this case.

In addition to the contractual obligations specified in the LLC agreement and bankruptcy documents there is further precedence in cases when non-Debtors are indemnified by the Debtor, its Estate and its Assets. In cases in which a claim against the non-debtor will have an immediate adverse economic impact on the estate, the automatic stay may be extended to non-debtors. See Queenie v. Nygard Int'l, 321 F.3d 282, 287-88 (2d Cir. 2003). Relying on A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir.), cert. denied, 479 U.S. 876 (1986), courts have extended the automatic stay to nonbankrupt codefendants in "unusual circumstances." As the case law demonstrates, courts have found "unusual circumstances" where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." Id. at 999 (relying on both the automatic stay provision and the bankruptcy court's equitable powers under 11 U.S.C. §(s) 105 to enjoin actions against nondebtor codefendants in the Dalkon Shield products liability litigation because of the potential impact on the estate and the availability of insurance proceeds to satisfy the claims); see also, In re American Film Technologies, Inc., 175 B.R. 847, 855 (Bankr.D.Del. 1994) (staying

prosecution of wrongful discharge claims against former and present directors of debtor corporation because of debtor's indemnification obligations and its possible exposure to collateral estoppel prejudice); In re Family Health Services, Inc., 105 B.R. 937, 942-43 (Bankr.C.D.Cal. 1989) (staying collection actions against nondebtor members of debtor HMO because judgments against nondebtors would trigger claims for indemnification from the debtor HMO).

While any single action prohibited by the Injunction violates said Injunction and should serve as the basis for the dismissal of the case against Mr. Dulac, we detail several below. Section 8.4(b) of the Plan specifically prohibits Mr. Oppenheimer, a creditor, from enforcing, collecting or recovering in any matter or means **directly** or **indirectly** any judgment or award against the Debtor or its assets. This alone should be the basis for dismissal as any judgement or awards against Mr. Dulac would irreparably damage the Debtor, its Estate and its Assets. The Debtor runs a very small business, with currently less than $1,000 in the bank, which will lose money per the Plan in 2023 and cannot even afford to pay its CEO or any other employee in 2023. Plaintiff has specified in their initial complaint that they are seeking between $30,000 to $150,000 for each work infringed, plus legal fees and other expenses. Any judgement would clearly make FST insolvent.

Section 8.4(a) prohibits conducting and continuing any lawsuit directly or indirectly against the Debtor, its Estate and its Assets. This clause is meant to protect against creditors, such as the Plaintiff, from taking legal action against the Debtor's Assets and to protect the Debtor's property and resources post-bankruptcy. Given that Mr. Dulac is indemnified by the Debtor and Debtor is contractually obligated to advance any suit related expense, legal or otherwise, to defend Mr. Dulac, a suit against Mr. Dulac is a suit against the Debtor, its Estate

and Assets. This violation is yet another basis for dismissal as Plaintiff's goal in conducting and continuing a suit against Mr. Dulac is to force a large payment or settlement, which the Debtor and its Estate is ultimately contractually responsible for. By continuing the suit against Mr. Dulac, the sole operator of business post-bankruptcy, Plaintiff continues to irreparably hurt the Debtor and its Estate as he is continuously pulled away from running the business on behalf of creditors and instead re-directed to spend hundreds of hours on this case. By ultimately continuing and conducting the suit against Mr. Dulac (and at the minimum indirectly against the indemnifying Debtor and Estate), Plaintiff is looking to get special treatment that all the other creditors as well as not providing the Debtor with the benefit of a fresh start or the finality to the bankruptcy process.

Section 8.4(c) of the Plan prohibits the Plaintiff from "creating … directly or indirectly any encumbrance of any kind against the Debtor or the assets of the Debtor". With Section 5(f) on the LLC Agreement stated that "[e]ach Indemnified Person shall have a **claim** against the **property** and **assets** of the Company for payment of any indemnity amounts from time to time due hereunder", this suit against Mr. Dulac would create an "encumbrance against the Debtor or the assets of the Debtor". More specifically, any expenses already incurred by Mr. Dulac and any judgement, action or award against Mr. Dulac gives Mr. Dulac claims and creates encumbrances against the Debtor and its Estate, including its property and Assets. Again, this on its own is a basis for dismissal.

Section 8.4(e) prohibits Plaintiff from proceeding in **any manner** **in any place** whatsoever that does not **conform** to or **comply** with the **provisions of the Plan.** While I have already listed several areas, amongst others, where Plaintiff has not complied with the plan, it is worth noting, that Plaintiff never filed an objection to their total claimed amount as an unsecured

creditor. To now, request additional payments outside of this agreed to amount, is to ask for special treatment over other creditors.

Beyond the above specified in the Company's corporate and bankruptcy related documents and precedent cases with regards to indemnified non-debtors with regards to the automatic stay, there is additional cases that delve into discharge injunction when the non-debtor is indemnified by the Debtor. Courts in the First and Eighth Circuits have allowed third-party non-debtor releases when the factors outlined in In re Master Mortg. Fund, Inc. are balanced. *See In re Mahoney Hawkes, LLP, 289 B.R. 285, 299–303 (Bankr. D. Mass. 2002)* (adopting the Master Mortgage multi-factor test to determine necessity for non-debtor third-party injunctions) *(citing In re Master Mortg. Inv. Fund, Inc., 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994) ); In re U.S. Fidelis, Inc., 481 B.R. 503, 519 (Bankr. E.D. Mo. 2012); In re Midway Gold U.S., Inc., 575 B.R. 475, 503-05 (Bankr. D. Col. 2017)* (noting the same test was adopted in the First, Second, Fourth, Sixth, and Eleventh Circuits).

Those Master Mortgage five factors include when:

(1) There is an identity of interest between the debtor and the third-party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.

(2) The non-debtor has contributed substantial assets to the reorganization.

(3) The injunction is essential to reorganization. Without the it, there is little likelihood of success.

(4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment.

(5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

The U.S. Bankruptcy Court for the District of Delaware believes the Master Mortgage factors form the foundation for such an analysis, with additional consideration of other relevant factors, while the Third Circuit has not adopted a specific test for when such releases are appropriate. Per Master Mortgage, these factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness. *Master Mortgage, 168 B.R. at 935* (finding that there is no "rigid test" to be applied in every circumstance and that the five factors are neither exclusive, nor conjunctive). *In re Washington Mutual, Inc., 442 B.R. 314, 346–47 (Bankr. D. Del. 2011)* ("Determining the fairness of a plan which includes the release of nondebtors requires the consideration of numerous factors and the conclusion is often dictated by the specific facts of the case.") *(citing In re Continental Airlines, 203 F.3d at 212–14 ); see also In re Zenith Elecs. Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999)* (in considering debtor's release of third parties, court applied Master Mortgage five factor test).

The Non-Debtor is clearly one of these "unusual circumstances" and due consideration should be given to the overlapping factors described above and such a determination should be dictated by the specific facts of this case. More specifically, with regards to the five factors:

(1) There is a documented indemnity relationship between Mr. Dulac and the Debtor (including in cases of gross or passive negligence), such that a suit against the Non-Debtor is, in essence, a suit against the Debtor. The Debtor which has less than $1,000 currently in the bank, would have assets of the estate depleted from any judgement against Mr. Dulac. As noted previously, Plaintiff is seeking $30,000-$150,000 per infringed work, plus legal fees and other expenses.

(2) Mr. Dulac has not taken any salary from the Debtor since November 2020, since the bankruptcy proceeding and through the current re-organization to ensure a viable plan is in place to satisfy creditors. Mr. Dulac in fact loaned money to the business during COVID, invested in legal fees to retain bankruptcy counsel and ultimately was responsible for acquiring certain assets from the Debtor for $75,000, which enabled the company to emerge from bankruptcy. As noted in the Plan and other related documents, Mr. Dulac paid above and beyond the value of these design-related assets from FST to ensure professional and court-related fees were covered and to meet the Court's request to pay creditors $25,000 upfront. Mr. Dulac further secured a loan to the Debtor for additional monies to cover basic working capital. In order to minimize the burden of this loan to FST, he extended the loan repayment after the Plan was finalized in 2026 in order to ensure planned payments to creditors during the Plan. Furthermore, Mr. Dulac agreed to push back his preferred secured claims, which were due upfront and upon initial claim payment, to prioritize payment to other unsecured creditors over himself. Mr. Dulac has invested in and sacrificed a tremendous amount of time and money to the benefit of creditors, the Company, its Assets and its Estate.

(3) This injunction is essential to the reorganization. Without the injunction, there is little likelihood of success of the business and its creditor recovery. As mentioned, Debtor is currently wholly managed by Mr. Dulac upon emergence bankruptcy, to keep costs low, with Mr. Dulac currently not taking any salary, despite the burden this has put on him personally. This injunction is critical for several reasons. Firstly, Mr. Dulac has to defend himself pro se, because Debtor does not currently have the necessary financing, which it is contractually obligated to advance to Mr. Dulac to defend himself. Mr. Dulac

is not a lawyer and the work related to this case is taking up hundreds of hours of times, which Mr. Dulac should be spending on reviving the business to the benefit of creditors. This has already deeply harmed the estate and continues to every day. Since Mr. Dulac is the only current employee of the Company. Any time working on this case, means no one else is working on the business at that time. Secondly, any judgement of any amount against Mr. Dulac and therefore the Debtor would highly likely push the Debtor to insolvency and make it impossible to meet the obligations to creditors under the Plan.

(4) We have not had any creditor file a complaint against the injunction with the Bankruptcy Court and all claim objectives with creditors have been resolved. Given that the bankruptcy falls under Chapter 11 Subchapter V, which was enacted to protect small business, the Court ultimately confirms the plan if it meets certain requirements as opposed to a vote by creditors under a more traditional Chapter 11. The Plan was ultimately confirmed on February 7, 2023 when signed by the Honorable Judge Garrity. Plaintiff himself never objected to his claim amount to the Bankruptcy Court. We simply see Plaintiff's disregard of the Injunction generally and pursuing suit against Mr. Dulac specifically as a tactic to push for a settlement. This is after all, the same Plaintiff that blatantly ignored the automatic stay protection of the Debtor during the bankruptcy.

(5) We don't believe any claims, including any of the unsecured claims in the case, are affected by the existence of the injunction. In fact, the only way unsecured claimants will get impacted further at this point is if an injunction in not granted to Mr. Dulac, as the business can become insolvent or not provide creditors with the expected recovery under the Plan. Moreover, as stated above, that Plaintiff never objected to the claim amount of $1,864.50 noted in the bankruptcy petition (a de minimis 0.15% of the total claims),

despite having close to one year to do file a claim objection. In fact, Plaintiff's counsel

has mentioned on a status update call with the Honorable Judge Wood, that he would

provide support information to receive payment from Mr. Dulac personally to be made

whole on this amount and thereby Plaintiff would receive "payment of all, or

substantially all", of the claimed amount listed.

## CONCLUSION:

Currently only managed by Mr. Dulac, FST is a small company working very hard and in

a very lean manner to revive the business and execute on its plan on behalf of its creditors. After

earlier this year emerging from Chapter 11, Subchapter V, meant to protect small businesses,

Debtor now sees its solvency and ability to deliver on its plan to creditors put into jeopardy by

Plaintiff's case against Mr. Dulac. The time Mr. Dulac must spend on the case (and not execute

on the Plan) is currently devastating the business and the financial consequence of any damages

or awards would likely shut down the business and thereby irreparably damaging the Debtor, its

Assets and its Estate. The LLC agreement makes it contractually very clear that Mr. Dulac, both

an Officer and a Managing Director of FST, shall have a claim against FST's Estate (i.e. its

property and assets) from any damages pursuant to this lawsuit against Mr. Dulac, "including

without limitation, indemnification against active or passive negligence or breach of duty". In

addition to the language very clearly written in the LLC Agreement Section 5(f) and the Plan

Section 8.4, there is further precedence with regards to non-debtors treated as one and the same

as the Debtor and therefore receiving similar protection from the Discharge Injunction. While

only a guideline with regards to fairness, the Master Mortgage five factors do speak to (i) why

this injunction is essential for the company to survive, (ii) why any damages or judgement

against Mr. Dulac would deplete the Debtor and its Assets, (iii) how Mr. Dulac has contributed

above and beyond (cash investment, deferred compensation and loans) to ensure the Company's ability to deliver on the plan and to fund its emergence from bankruptcy, (iv) the fact that the Plan was confirmed by the Bankruptcy Court per Subchapter V criteria and (v) how the Plaintiff likely to be made substantially whole on their claimed amounts.

In light of all these factors and to insure Debtor's ability to successfully deliver on the Plan to creditors, any cases against Mr. Dulac should be dismissed and the discharge injunction enforced on his behalf.

Respectfully submitted.

Alexander Dulac, Pro Se

_____

Alexander Dulac
Defendant, Pro Se
Telephone: (646) 621-6269
Email: alex.dulac@gmail.com

THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| David Gordon Oppenheimer, | |
| Plaintiff, | Case No. 1:21-cv-02961 |
| v | Dist. Judge Andrea R. Wood |
| First Step Trademarks, LLC and Alexander C. Dulac | Mag. Judge Jeffrey T. Gilbert |
| Defendants. | |

## DECLARATION OF ALEXANDER C. DULAC
## IN SUPPORT OF THE MOTION TO DISMISS FOR VIOLATION OF THE
## DISCHARGE INJUNCTION AGAINST ALEXANDER C. DULAC

I, Alexander Dulac, of New York City, in New York, declare as follows:

1.      I am a defendant and represent myself, pro se, in connection with the above-captioned lawsuit.

2.      This Declaration is submitted in support of my motion to dismiss the case against Mr. Dulac ("Dulac") following the emergence from bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York ("Bankrupt Court") on February 7, 2023.

3.      Oppenheimer continues to pursue the suit against Mr. Dulac despite the discharge injunction from the Bankrupt Court.

4.      I included the amended plan of reorganization dated November 21, 2022 (the "Plan") in Exhibit A, with Section 8.4 summarizing the injunction in the case, and the order of confirmation dated February 7, 2023 (the "Confirmation Plan") in Exhibit B.

1

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted.

/s/ Alexander Dulac, Pro Se

Alexander Dulac

Defendant, Pro Se

Telephone: (646) 621-6269

Email: alex.dulac@gmail.com

# EXHIBIT A

**MCGRAIL & BENSINGER LLP**
888-C 8th Avenue #107
New York, New York 10019
Ilana Volkov, Esq.
Pearl Shah, Esq.
(201) 931-6910 (phone)
ivolkov@mcgrailbensinger.com

*Counsel for Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ X

In re:

FIRST STEP TRADEMARKS, LLC,

Debtor.

------------------------------------------------------ X

Chapter 11
Subchapter V
Case No.: 21-12147 (JLG)

## AMENDED PLAN OF REORGANIZATION FOR
## SMALL BUSINESS UNDER SUBCHAPTER V OF CHAPTER 11

First Step Trademarks, LLC, debtor and debtor in possession herein (the "Debtor"), hereby proposes the following Amended Plan of Reorganization for Small Business Under Subchapter V of Chapter 11 (the "Plan").

You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on the Plan.

Your rights may be affected by this Plan. You should consider discussing this document with an attorney.

## BACKGROUND[1]

### A. Description and History of the Debtor's Business.

The Debtor is a Delaware limited liability company, which was founded by Alexander Dulac. Mr. Dulac owns approximately 65% of the Debtor's membership interests. The Debtor owns and operates a web-based business called The Plunge; its website is https://www.theplunge.com. The Plunge provides grooms with wedding-related information online including with respect to proposals, engagement rings, honeymoons, bachelor parties, attire,

---

[1] This Plan is for a small business debtor under Subchapter V of Chapter 11 of the Bankruptcy Code. Section 1190 of the Bankruptcy Code requires that such a plan include "(A) a brief history of the business operations of the debtor; (B) a liquidation analysis; and (C) projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization." The information in this section of this Plan is provided for that purpose.

and select wedding day responsibilities. The Plunge also launched an email system, customized to a couple's wedding date, and has layered in various tools to serve as a broader resource for grooms.

Originally founded in 2011, the Debtor's business kicked into full gear at the end of 2016 when it raised its first notable outside funds. Throughout the years, the Debtor secured outside investments and/or funding in the total amount of $2,362,500. The proceeds of these capital raises were used to build out the Company's core media assets (including content, email and tools), design a wedding band business and fund general operating expenses.

The latest investment closed during the summer of 2019, for a total of $992,500. This latest fund raise allowed the Debtor to target its efforts on making The Plunge a more complete, all-in resource for grooms in key categories, with deeper dives into travel, jewelry, fashion, proposals, gifting, wedding planning, and finances, and to add more value to grooms and brides who signed-up for emails or who were googling for relevant content. In turn, this significant growth in content enabled the Debtor to redirect its time and resources to rebuilding its custom email system, which then served as a platform for distributing its newly created content.

During this time, the Debtor also started constructing two other tools, including a custom quiz and playbook to learn more about its audience and to serve as a lead magnet, and a "who's coming to the wedding" tool. Although all the designs, illustrations and majority of the coding was completed for these tools by March 2020, the Debtor decided at the onset of the COVID-19 pandemic to prioritize its limited financial resources on completing the email system and going live with previously written content, tabling those other key tools until weddings fully resumed. Going into the pandemic, the Debtor also completed the branding and designs for a direct-to-consumer wedding band business and had worked on the design of a wedding-related mobile application.

After the Debtor launched the core media assets, it planned to turn its attention to monetizing them ahead of summer and fall 2020 weddings. The Debtor also planned to leverage the website to drive traffic to its wedding band business.

Unfortunately, with the onset of the global COVID-19 pandemic, those plans were placed abruptly on hold. The pandemic devastated the wedding industry, as most weddings were cancelled, rescheduled or significantly reduced in budget for more than 15 months. Moreover, the pandemic created material day-to-day uncertainty and lack of visibility as to when weddings would resume to pre-pandemic levels for the vast majority of the country. Accordingly, the Debtor's business was placed on hold pending a clearer and more certain path to the return of weddings.

**B. The Debtor's Chapter 11 Bankruptcy Filing.**

The Debtor filed its Chapter 11 bankruptcy petition on December 31, 2021 (the "Petition Date"). The Debtor's financial difficulties were exacerbated by the onset of the global COVID-19 pandemic, which had a particularly devastating effect on the wedding industry. As a result of the pandemic, most weddings were cancelled, rescheduled, or significantly reduced in budget for more than 15 months.

In addition, one investor group holding a convertible promissory note in the principal amount of $600,000 (i) threatened litigation starting in October 2020 unless repaid immediately and, ultimately, (ii) sued the Debtor for repayment of the note in September 2022. This litigation overhang severely impeded the Debtor's ability to obtain much needed new capital in time for the resumption of the wedding business and to capitalize on the significant investments theretofore made.

### C. The Debtor's Assets.

The Debtor estimates the book value of its assets as of the Petition Date to be $351,000. Those assets consist primarily of intellectual property and good will.

### D. The Debtor's Liabilities.

The total of scheduled claims and proofs of claim filed is $2.59 million; however, there is an overlap between the proofs of claim and the scheduled amounts to the extent of approximately $758 thousand. Accordingly, the Debtor estimates its general unsecured liabilities to total approximately $1.3 million.

The Debtor has examined all proofs of claim which have been filed in this case and plans to object to the following unsecured claims, which do not comport with its books and records:

| Creditor | Scheduled Claim Amount | Proofs of Claim Amount | Objection Amount/Dispute | Reason |
|---|---|---|---|---|
| Ward Mooney | $0 | $100,000 | $100,000 | Objecting as noteholder automatically converted to common stock |
| Rebel Capital, LLC | $0 | $100,000 | $100,000 | Objecting as noteholder automatically converted to common stock |
| Christopher Donnelly | $0 | $20,000 | $20,000 | Objecting as noteholder automatically converted to common stock |
| Plunge Group 2019 LLC | $0 | $241,920 | $241,920 | Objecting as noteholder automatically converted to common stock |

3

| Nico Trinkhaus | $0 | $30,864.02 | $30,864.02 | Does not comport with books and records. |
|---|---|---|---|---|
| Strand Studio LLC | $5,000 | $10,000 | $5,000 | Included Strand Studio on Scheduled Claims, but its principal Lacey Waterman filed duplicate claim. |
| Department of Labor | $10,416 | $24,019.21 | $13,603.21 | Included Jake Masucci on Scheduled Claims, but Department of Labor filed duplicate claim. |
| **Total** | | $526,803.23 | $511,387.23 | |

### E. Liquidation Analysis.

To confirm this Plan, the Court must find that all creditors who do not accept this Plan will receive at least as much under this Plan as such claim holder would receive in a chapter 7 liquidation. For purposes of demonstrating this requirement, the Debtor has prepared a liquidation analysis attached hereto as Exhibit A. The liquidation analysis does not include any avoidance actions as the Debtor is not aware of the existence of any such actions. The liquidation analysis shows that if the Plan is not confirmed and the Debtor's case is converted to chapter 7 as a result, creditors will receive no distribution.

### F. Ability to Make Future Plan Payments and Operate Without Further Reorganization.

The Debtor also must show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the Debtor's business. For purposes of demonstrating this requirement, the Debtor has prepared projected financial information attached hereto as Exhibit B (the "Cash Flow Projections"), which reflects that the Debtor will have projected disposable income (as defined by § 1191(d) of the Bankruptcy Code) for three years to make distributions to holders of Allowed Claims.

4

## ARTICLE I
## SUMMARY

The Plan proposes to pay creditors of the Debtor from funds generated by the Debtor's operations as a going concern.

The Plan provides for:        One (1) class of (non-tax) priority claims
                              One (1) class of general unsecured claims;
                              One (1) class of Equity Interests; and
                              One (1) class of Options.

The Plan provides for the full payment of Allowed priority claims in accordance with the Bankruptcy Code. General unsecured creditors holding Allowed Claims will receive the Initial Unsecured Creditor Payment (as defined below) and distributions of the Debtor's projected disposable income for the years ended 2023, 2024 and 2025, as set forth in Exhibit B over a period of three (3) years from the Effective Date. The Debtor reasonably estimates that the total recovery to holders of Allowed General Unsecured Claims will be approximately eighteen percent (18%), but the actual distribution(s) percentage will depend on the total final Allowed General Unsecured Claims and potential post-confirmation costs should the Plan be confirmed nonconsensually under §1191(b).[2] The Plan further provides for the continued retention of Equity Interests and the cancellation of Options.

All creditors should refer to Articles III through VI of the Plan for information regarding the precise treatment of their claim.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTEREST

**2.1    Class 1 Claims – (Non-Tax) Priority Claims.**

Class 1 Claims consist of the Allowed Claim of Alexander Dulac for services rendered to the Debtor within 180 days before the Petition Date.

**2.2    Class 2 Claims – Unsecured Claims.**

Class 2 Claims consist of Allowed General Unsecured Claims.

**2.3    Class 3 Interests – Equity Interests.**

Class 3 consists of Membership Interests in the Debtor.

---

[2] Potential post-confirmation costs may include the cost of procuring a bond for the Subchapter V Trustee and her services rendered as Disbursing Agent. The Subchapter V Trustee will be compensated at her applicable billing rate, which may be adjusted annually. Her 2022 billing rate is $575 an hour.

**2.4    Class 4 Interests – Options.**

Class 4 consists of Options.

## ARTICLE III
## TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS, AND COURT FEES

**3.1    Unclassified Claims.**

Pursuant to § 1123 of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified.

**3.2    Administrative Expense Claims.**

Each holder of an Allowed Administrative Expense Claim will be paid in full on the later of (i) the Effective Date of the Plan or (ii) thirty (30) days after such Claim becomes Allowed, or upon such other terms as may be agreed upon by the holder of the Claim and the Debtor.[3] The estimated Administrative Expense Claims through the date of the filing of this Plan are as follows:

| Name | Title | Amount |
| --- | --- | --- |
| McGrail & Bensinger LLP | Counsel to Debtor | $75,000[4] |
| Jolene Wee | Subchapter V Trustee | $10,000 |

**3.3    Priority Tax Claims**

Secured and priority tax claims have been asserted by the New York Department of Taxation ("NYDT") in the total approximate amount of $1,000. Based on discussions the Debtor has had with the NYDT, the Debtor reasonably believes that the NYDT will agree to reclassify those claims to General Unsecured Claims. To the extent an agreement cannot be reached, the Plan provides for payment in full of said tax claims on the later of the Allowance of the Claim or thirty (30) days of the Effective Date.

**3.4    Statutory Fees**

N/A.

---

[3] Mr. Dulac has not received any reimbursement for services rendered to the Debtor since the Petition Date. He believes he holds an Administrative Claim for unpaid monthly reimbursements for the period January 1, 2022, to the Effective Date. Said claim will be paid starting in 2026 after, and conditioned upon, the funding of the final payment to holders of Allowed General Unsecured Claims of the Reorganized Debtor's disposable income for the year 2025. His agreement to defer payment of his Administrative Claim applies only in the event the Plan is confirmed; in the event the Plan is not confirmed and this case is converted to Chapter 7, Mr. Dulac advises he does not agree to the deferment/subordination of his Administrative Claim.

[4] This amount includes the retainer of $21,096.50 being held by Debtor's counsel; fees and expenses will continue to accrue through the Effective Date of the Plan.

## ARTICLE IV
## TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

**4.1**   Claims and interests shall be treated as follows under the Plan:

| Class | Impairment | Scheduled Amount | Treatment |
|---|---|---|---|
| Class 1 – Priority Non-Tax Claims | Impaired | $60,000 (subject to a cap of $13,650) | Class 1 consists of the Allowed Priority Non-Tax Claim of Alexander Dulac. In full satisfaction of this Allowed Priority Claim, Mr. Dulac will receive the sum of $6,825 in 2024 and $6,825 in 2025. The balance of the Allowed Priority Claim will be included in Class 2.<br><br>Class 1 Claims is impaired and, therefore, entitled to vote on the Plan.  However, because the Class 1 creditor is an "insider" and his vote does not count, he will not receive a ballot. |
| Class 2 – Unsecured Claims | Impaired | $1,289,907.67[5] | Class 2 consists of Allowed General Unsecured Claims. In full satisfaction of its Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim will receive a Pro Rata distribution of: (i) within the later of thirty (30) days of the Effective Date or Allowance of the Claim, the sum of $25,000 (the "Initial Unsecured Creditor Payment"); and, thereafter, (ii) the Debtor's projected disposable income for three (3) years as set forth in Exhibit B: for the year 2023, the estimated amount of **$19,435** will be made by January 31, 2024; for the year 2024, the estimated amount of **$65,065** will be made by January 31, 2025; and for the year 2025, the estimated amount of **$123,620** will be made by January 31, 2026, for a total approximate Pro Rata distribution of approximately eighteen (18) percent.[6] |

---

[5] The total Allowed amount of General Unsecured Claims may be affected by the claim objections brought by the Debtor and the Court's adjudication thereof.
[6] The actual distribution(s) percentage to holders of Allowed General Unsecured Claims will depend upon the pool of total Allowed General Unsecured Claims.

7

| Class 3 – Equity Interests | Unimpaired | N/A | Class 3 consists of Allowed Equity Interests. Upon the Effective Date of the Plan, each holder of an Allowed Equity Interest shall retain such Interests. Class 3 Interests are unimpaired and, therefore, holders of Class 3 Equity Interests are deemed to have accepted the Plan. |
|---|---|---|---|
| Class 4 – Options | Impaired | N/A | Class 4 consists of Options. Upon the Effective Date of the Plan, all Options will be cancelled. Class 4 Interests are impaired; because Class 4 will receive no distribution under the Plan, Class 4 is presumed to have rejected the Plan. |

## ARTICLE V
## ALLOWANCE AND DISALLOWANCE OF CLAIMS

### 5.1    Objections to Claims.

The Debtor may continue to prosecute any objection to any claim filed prior to confirmation of the Plan after the Effective Date. Any Claim subject to an objection which has not been adjudicated by Final Order or otherwise resolved prior to Confirmation will be treated as a Disputed Claim under the Plan. Any objections to Claims shall be filed by the Debtor no later than one hundred and twenty (120) days after the Effective Date, which deadline may be extended by the Court upon application or motion of the Debtor without notice filed prior to the deadline. In the event that any proof of claim is filed, asserted or amended after the Effective Date, the Debtor shall have one hundred twenty (120) days from the date of such filing or notice to object to such claim, which deadline may be extended by the Court upon application or motion of the Debtor without notice filed prior to the deadline. All objections shall be litigated (or settled) to Final Order. The Bankruptcy Court shall retain jurisdiction to adjudicate any and all objections to claims whether filed prior to or after the Effective Date.

### 5.2    Disputed Claim Reserve.

No distribution will be made on account of a Disputed Claim unless such Claim is Allowed. On any date that distributions are to be made under the terms of this Plan, the Disbursing Agent shall deposit in one or more accounts (either an attorney escrow account or a segregated account with a banking institution that is a depository authorized by the United States Trustee for bankruptcy cases in the Southern District of New York), cash equal to 100% of the cash that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto, including, but not limited to (i) Disputed Claims that may be entitled to treatment as administrative expenses or as priority claims pursuant to §§ 503 and 507 of the Bankruptcy

8

Code, (ii) claims of governmental units for any tax and (iii) any amount due but not payable on the Effective Date on account of administrative expenses or claims entitled to priority pursuant to §§ 503 and 507 of the Bankruptcy Code. The Disbursing Agent shall also segregate any interest, dividends or proceeds of such cash. Such cash together with any interest, dividends or proceeds thereof, SHALL be held in trust for the benefit of the holders of all such Disputed Claims pending determination of their entitlement thereto. Within fourteen (14) days after the entry of a Final Order resolving an objection to a Disputed Claim, the Disbursing Agent shall distribute all cash, including any interest, dividends or proceeds thereof, to which a holder is then entitled with respect to any Disputed Claim that has become an Allowed Claim.

## ARTICLE VI
## MEANS FOR IMPLEMENTATION OF THE PLAN

**6.1    Funding of the Plan.**

On the Effective Date, the Debtor will have entered into an asset purchase agreement or similar document of conveyance with One Road Home, Inc., a newly formed entity ("ORH"), pursuant to which the Debtor will sell and transfer to ORH, and ORH will buy from the Debtor, the Wedding Band Assets and the Planning App Graphics for the sum of $75,000 (the "Purchase Price").[7] Additionally, on the Effective Date, ORH will provide the Reorganized Debtor with a drawdown loan facility in the total amount of $12,500 (the "Loan"), the proceeds of which will be used to fund go forward business operations as set forth in the Cash Flow Projections. The proceeds of the Purchase Price will be used to fund (a) payments to Allowed Priority Tax Claims and Allowed Administrative Expense Claims as well as (b) the Initial Unsecured Creditor Payment.

Additionally, on the Effective Date, the Debtor and ORH will enter into one or more Service Agreements/Media Agreements pursuant to which ORH will pay the Debtor to run ads on The Plunge platform. The anticipated revenue the Reorganized Debtor will receive from these agreements is reflected in the Cash Flow Projections.

One Road ("OR"), which is distinct in name from The Plunge, will be selling men's wedding bands directly to consumers through its own website. Every year, there are approximately two million weddings in the U.S. (absent the COVID timeframe), with the vast majority of men buying a wedding band. The Plunge, and other strategic outlets developed exclusively by Mr. Dulac, will drive traffic to OR's website. OR will advertise its business on The Plunge and pay advertising money to the Debtor in exchange. OR's fixed, contractual relationship with the Debtor is significantly more beneficial to the Debtor than the more typical automated programmatic advertising where brands generally bid on an exchange for advertising on the site at commoditized levels (wherein The Plunge would receive only about $1,000 per month in revenue given its very niche, sub-scale audience). ORH plans to soft launch the wedding band business

---

[7] The graphic designs, product samples, branding, and packaging that have been developed to date for the wedding band and planning app business have little or no inherent value; accordingly, the Purchase Price is a reflection more of the funds necessary to confirm the Plan than the actual value (if any) of these assets.

approximately four months after the Effective Date and to hard launch three months thereafter when it plans to market on The Plunge more comprehensively.

Once the wedding band business is inaugurated, ORH will focus on launching the Planning App, which will also be distinct in name from The Plunge. The Planning App is still in its early stages of development, having only preliminary graphic designs. However, Mr. Dulac has identified talented partners to work with to develop this business. Mr. Dulac anticipates that the Planning App will have a soft launch in the fourth quarter of 2023 and a hard launch in the first quarter of 2024. The Planning App will be marketed across multiple distribution channels, including on The Plunge. The Planning App will pay The Plunge advertising dollars pursuant to a contractual relationship in exchange for traffic and leads. It is anticipated that the Planning App will generate income from advertising and partnerships in the travel business, as well as from other sources; in turn, from this revenue, the Planning App will be able to comply with its contractual arrangement with The Plunge.

Finally, going into 2024, with both the Wedding Band business and the Planning App launched, The Plunge plans to partner with other companies seeking to reach The Plunge audience, across other verticals, namely in suiting, honeymoons and other decision grooms are involved in. Mr. Dulac will be leading this partnership effort and will have the benefit of the full year of 2023 to finalize these partnerships.

The distributions that are to be made on and after the Effective Date under this Plan shall be funded from the Purchase Price and the Reorganized Debtor's business operations. In the event the Court approves this Plan as a consensual Plan, then the Reorganized Debtor shall be the Disbursing Agent responsible for making any and all post-Confirmation payments that are required under the Plan. In the event the Court approves this Plan by cramdown, the Debtor proposes the Subchapter V Trustee to serve as the Disbursing Agent.

## 6.2    Post-Confirmation Management.

The Debtor's post-confirmation operations will continue to be managed by Alexander Dulac. Mr. Dulac's compensation shall consist of $3,000 in salary in 2023, $60,000 in 2024 and $75,000 in 2025, all as reflected more specifically in the Cash Flow Projections.

Mr. Dulac also will have an ownership and management role in ORH. On the Effective Date, he will own 100% of ORH's membership interest, which will be subject to dilution as a result of the conversion of SAFE notes issued to current and prospective investors. He will be ORH's CEO.

## ARTICLE VII
## GENERAL PROVISIONS

**7.1    Definitions and Rules of Construction.**

The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan, and they are supplemented by the following definitions:

(i)    "Administrative Expense Claim" means any cost or expense of administration of the Chapter 11 case entitled to priority under Section 507(a)(2) of the Code and allowed under Section 503(b) of the Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the Petition Date, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Subchapter V Trustee for fees and/or reimbursements, and any fees or charges assessed against the Debtor's estate under Chapter 123, Title 28, United States Code (which is not applicable in a Subchapter V case).

(ii)    "Allowance" means when a Claim becomes an Allowed Claim.

(iii)    "Allowed" or "Allowed Claim" means any Claim or Interest against the Debtor that is scheduled by or on behalf of the Debtor as not disputed, contingent or unliquidated, or proof or request for payment of which has been filed timely with the Bankruptcy Court and, in either case, a Claim (a) as to which no objection has been interposed within one hundred twenty (120) days after the Effective Date or (b) as to which an objection has been interposed and such Claim has been allowed by a Final Order of the Bankruptcy Court.

(iv)    "Bankruptcy Code" means title 11 of the United States Code (11 U. S.C. §§ 1101, *et seq.*).

(v)    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as in effect on the Filing Date and as amended after the Filing Date and during the Debtor's chapter 11 case.

(vi)    "Claim" means any right to payment from the Debtor and/or any or all of the Released Parties arising, or with respect to which the obligation giving rise to such right has been incurred, before the Effective Date of this Plan, and based upon, concerning, relating to, or in any manner arising from, in whole or in part, the Debtor and/or the Debtor's operations, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or any right to an equitable remedy for breach of performance arising, or with respect to which the obligation giving rise to such right has been incurred, before the Effective Date, if such breach gives rise to a right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

11

unsecured. FOR THE AVOIDANCE OF DOUBT, "CLAIM" SHALL SPECIFICALLY AND EXPRESSLY INCLUDE ALL CLAIMS UNDER FEDERAL, STATE AND/OR LOCAL LAW OR REGULATION.

(vii)    "Confirmation Date" means the date on which the Court enters the Confirmation Order.

(viii)    "Confirmation Order" means an order of the Bankruptcy Court confirming the Plan.

(ix)    "Disputed Claim" means (a) any Claim that is listed in the Schedules as disputed, contingent or unliquidated and with respect to which no Proof of Claim has been filed; and (b) any Claim, or portion thereof, that has not been disallowed and with respect to which an objection or action concerning the allowance and/or extent thereof, in whole or in part, has been interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, to the extent that any such objection or action has not been resolved by a Final Order.

(x)    "Debtor's Professionals" means such attorneys, accountants and/or other professionals employed by the Debtor in connection with this case.

(xi)    "Disbursing Agent" means, if a consensual Plan, the Reorganized Debtor; if a nonconsensual Plan, the Subchapter V Trustee.

(xii)    "Effective Date" means the first business day following the date that is fourteen (14) days after the entry of the order confirming this Plan. If, however, a stay of the confirmation order is in effect on that date, the Effective Date will be the first business day after the date on which the stay expires or is otherwise terminated.

(xiii)    "Equity Interest" means a membership unit in the Debtor.

(xiv)    "Final Order" means an order of a court as to which (a) any appeal that has been taken has been determined finally or dismissed or (b) the time for appeal has expired and (i) no timely appeal has been filed and (ii) no order having the effect of tolling or otherwise extending the appeal period is in effect.

(xv)    "General Unsecured Claim" means any Claim that is not an Administrative Expense Claim, a Priority Non-Tax Claim or a Priority Tax Claim.

(xvi)    "Options" means the option to buy Equity Interests.

(xvii)    "Planning App" means an application downloadable by users to their mobile devices in order to help with planning and organizing group events.

(xviii) "Planning App Graphics" means preliminary graphic designs and related intellectual property for the Planning App.

12

(xix)   "Priority Non-Tax Claim" means any Claim entitled to priority in payment under Section 507(a)(4) and (a)(5) of the Bankruptcy Code.

(xx)   "Priority Tax Claim" means any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

(xxi)  "Pro  Rata"  means,  with  respect  to  any  Allowed  Claim,  the proportions that such Allowed Claim bears to the aggregate amount of all claims in such class.

(xxii)  "Reorganized Debtor" means the Debtor in its post-Confirmation Order state.

(xxiii) "Wedding Band Assets" means all assets related to Debtor's wedding band business:

- o   All domain names related to OneRoad, including oneroadbands.com;
- o   All social media handles related to OneRoad;
- o   All registered and non-registered trademarks for OneRoad, as used and/or registered in or outside the United States;
- o   All packaging designs and samples, including the packaging system, sample box, final ring box and collateral;
- o   All digital wedding band designs;
- o   All physical samples of wedding bands;
- o   All website graphic designs;
- o   All brand books and related materials;
- o   All writing books and related materials; and
- o   Any and all other documents and intellectual property related to the wedding band business.

**7.2    Authority to Effectuate the Plan.**

Upon the Confirmation Order becoming a Final Order, all matters provided under the Plan shall be deemed to be authorized and approved without the requirement of further approval from the Bankruptcy Court or the Debtor. The Debtor shall be authorized, without further application to or order of the Bankruptcy Court to take whatever action necessary to achieve consummation and carry out the Plan and to effectuate the transactions provided for thereunder.

**7.3    Revesting of Assets.**

Consistent with §§ 1123(a)(5)(A) and 1141 of the Bankruptcy Code, except for the Wedding Band Assets and Planning App Graphics, title to all assets and property of the estate of the Debtor shall pass to, and vest in, the Reorganized Debtor free and clear of all Claims, Liens, charges and other rights of creditors arising prior to the Effective Date. On and after the Effective Date, the Reorganized Debtor may conduct its financial affairs and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court, except as otherwise provided in this Plan or in the Confirmation Order. Any distribution check that

is issued by the Reorganized Debtor but not deposited within one hundred twenty (120) days after its distribution will be deemed abandoned by such creditor and shall pass to and revert in the Reorganized Debtor free and clear of any claims to the distribution. No distribution(s) shall be made to any Allowed creditor if such distribution is $50.00 or less.

**7.4    Retention of Jurisdiction.**

Following the Confirmation Date and until such time as all payments and distributions required to be made and all other obligations required to be performed under the Plan have been made and performed and the Final Decree has been entered closing the Chapter 11 Case, the Bankruptcy Court shall retain jurisdiction over this proceeding under the provisions of the Bankruptcy Code, including, without limitation, § 1142(b) thereof and the Bankruptcy Rules, to ensure that the intent and the purpose of the Plan is carried out and given effect. Without limitation by reason of specification, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(a)    To consider any modification of the Plan pursuant to § 1127 of the Bankruptcy Code and/or any other modification of the Plan after substantial consummation thereof;

(b)    To hear and determine:

(i)    all controversies, suits and disputes, if any, as may arise in connection with the interpretation, implementation, consummation or enforcement of the Plan;

(ii)    all controversies, suits and disputes, if any, as may arise between or among the holders of any Class of Claim and the Debtor including, without limitation, proceedings to determine the allowance, classification, amount, or priority of Claims;

(iii)    all rights or Causes of Action which may exist on behalf of the estate, including actions commenced to recover preferential transfers, accounts receivable and other property of the estate;

(iv)    applications for allowance of compensation and expense reimbursement of the Debtor's Professionals, and the Subchapter V Trustee, for periods prior to the Effective Date;

(v)    any and all applications, adversary proceedings and litigated matters;

(vi)    to enter a final decree closing the Chapter 11 Case; and

14

(vii)    to the extent not expressly provided for above, any and all disputes arising under the Plan and proceedings in aid of the administration and/or consummation of the Plan.

**7.5    Post-Confirmation Reporting.**

The Reorganized Debtor shall file and serve on the United States Trustee quarterly reports, within 15 days after the conclusion of each calendar quarter, until this case is converted, dismissed, or closed by entry of the Final Decree. Any such reports shall be prepared consistent with (both in terms of content and format) the applicable Bankruptcy Court and United States Trustee's Guidelines for such matters. Mr. Dulac shall be responsible for preparing the aforementioned quarterly reports.

**7.6    Tax Consequences of the Plan.**

Any party concerned with how the plan may affect their tax liability should consult with their own accountants, attorneys and/or other advisors.

**7.7    Headings.**

Headings are used in the Plan for convenience of reference only and shall not constitute a part of the Plan for any other purpose.

**7.8    Revocation.**

The Debtor shall have the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Plan is revoked or withdrawn, it shall be deemed null and void, and in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtor, or any other entity, or to prejudice in any manner, the rights of the Debtor or any entity in any further proceeding involving the Debtor.

**7.9    Binding Effect.**

If the Plan is confirmed, the provisions of the Plan will bind the Debtor and all holders of Claims and Equity Interests, whether or not they voted to accept the Plan.

The rights, benefits and obligations named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the Debtor and all holders of Claims, Equity Interests and their respective successors and assigns. The provisions of all documents executed under or in connection with this Plan shall be valid and enforceable and binding upon and inure to the benefit of the Debtor and all other parties thereto and their respective predecessors, successors, assigns, agents, officers and directors.

**7.10    Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of New York shall govern the construction and implementation of the Plan and, unless otherwise stated therein, any agreements, documents, and instruments executed in connection with the Plan.

**7.11    Saturday, Sunday or Legal Holiday.**

If any payment or act under the Plan is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day, but shall be deemed to have been completed as of the required date.

**7.12    Enforceability.**

Should any provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability or operative effect of any and all other provisions of the Plan.

**7.13    Confirmation Order Controls.**

To the extent, the Plan is inconsistent with the Confirmation Order, the provisions of the Confirmation Order shall be controlling.

**7.14    Reservation of Rights.**

Neither the filing of the Plan nor any statement or provision contained therein shall be or be deemed to be an admission against interest. In the event that the Effective Date shall not occur, neither the Plan nor any statement contained therein may be used or relied upon in any manner in any suit, action, proceeding, or controversy within or outside of the Chapter 11 Case.

**7.15    Substantial Consummation.**

The Plan will be deemed substantially consummated, as such terms is used in § 1101(2) of the Bankruptcy Code, upon the commencement of distributions to the holder of any Class of Claims under the Plan. Additionally, the services of the Subchapter V trustee shall terminate when the plan has been substantially consummated unless the Subchapter V trustee is serving as Disbursing Agent.

**7.16    Plan Default Remedies.**

In the event any payment required pursuant to the Plan is more than ten (10) days overdue, the Reorganized Debtor shall file a notice with the Court indicating the default(s) and its plans, if any, to cure the default(s).  If the Disbursing Agent is not the Reorganized Debtor, the Disbursing

Agent shall notify the Court and the United States Trustee of any payment that is more than ten (10) days overdue. In the event of an uncured default, any aggrieved party shall be permitted to file a certification of default with the Court, on notice to the Reorganized Debtor, seeking such remedy as the aggrieved party deems appropriate including, but not limited to, seeking to convert the case to a case under chapter 7 of the Bankruptcy Code (which remedy the Reorganized Debtor shall have the opportunity to contest).

**7.17    Final Decree.**

On notice to the United States Trustee, the Debtor will file an application and proposed order for a final decree pursuant to Bankruptcy Rule 3022, without prejudice to the Court's ability to reduce or extend the time to file such application.

**ARTICLE VIII**
**DISCHARGE; LIMITATION OF LIABILITY**

**8.1    Discharge.**

(a) If this Plan is confirmed under § 1191(a) of the Bankruptcy Code, on the Effective Date of the Plan, the Debtor will be discharged from any debt and/or Claim that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Bankruptcy Code, except tha the Debtor will not be discharged of any debt:

      (i)    imposed by this Plan; or

      (ii)    to the extent provided in § 1141(d)(6).

**8.2**    If this Plan is confirmed under § 1191(b) of the Bankruptcy Code, confirmation of this Plan does not discharge any debt provided for in this Plan until the Court grants a discharge on completion of all payments due within the first three (3) years of this Plan, or as otherwise provided in § 1192 of the Bankruptcy Code. The Debtor will not be discharged of any debt:

      (i)    on which the last payment is due after the first three (3) years of this Plan, or as otherwise provided in § 1192 of the Bankruptcy Code; or

      (ii)    excepted from discharge under § 523(a) of the Bankruptcy Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

**8.3    Continuation of Stays.**

In the event the Plan is confirmed under § 1191(a), all stays provided for in the Chapter 11 Case under § 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. In the event the Plan is confirmed under § 1191(b), the stay of an act against property of estate under § 362(a) shall terminate on Effective Date, and the stay of any other act under § 362(a) shall remain in full force

and effect until the Debtor receives the discharge under § 1191.

**8.4    Injunction.**

Effective on the Effective Date, all creditors who have held, hold, or may hold Claims against the Debtor or its assets are enjoined from taking any of the following actions against the assets of the Debtor with respect to such Claims (other than actions brought to enforce any rights or obligations under the Plan or appeals, if any, from the Confirmation Order): (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against the Debtor or the assets of the Debtor; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree or order against the Debtor or its assets; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor or the assets of the Debtor; (iv) asserting any set-off, right of subrogation or recoupment of any kind directly or indirectly against any obligation due the Debtor or its assets; and (v) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan.

**8.5    Limitation of Liability.**

The Debtor and its members/managing member, the Debtor's Professionals and the Subchapter V Trustee shall have no liability whatsoever for any act or omission in connection with, or arising out of, the pursuit of approval of the Plan, or confirmation of the Plan, or the consummation of the Plan, or the transactions contemplated and effectuated by the Plan or the administration of the Plan or the property to be distributed under the Plan, or any other action or omission related to the administration of the Debtor's estate, or in contemplation of this Chapter 11 case, except for willful misconduct, gross negligence professional malpractice, fraud, or criminal conduct as determined by a Final Order of the Court and, in all respects will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

## ARTICLE IX
## CONFIRMATION REQUEST

**9.1**    The Debtor hereby requests of the Plan pursuant to §§ 1129 and 1191 of the Bankruptcy Code.

Dated: October 14, 2022
        New York, New York

Respectfully submitted,
FIRST STEP TRADEMARKS, LLC

By:    /s/ *Alexander Dulac*
       Alexander Dulac, Managing Director

**READ AND APPROVED:**

/s/ *Ilana Volkov*
Ilana Volkov
Pearl Shah
McGrail & Bensinger LLP
888-C 8th Ave. #107
New York, NY 10019

*Counsel for Debtor and Debtor in Possession*

# EXHIBIT B

4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
In re:

FIRST STEP TRADEMARKS, LLC,

                Debtor.

------------------------------------------------------- X

Chapter 11
Subchapter V
Case No.: 21-12147 (JLG)
Related Doc #58

## ORDER CONFIRMING DEBTOR'S AMENDED PLAN OF REORGANIZATION
## FOR SMALL BUSINESS UNDER SUBCHAPTER V OF CHAPTER 11

THIS MATTER having been opened to the Court by First Step Trademarks, LLC, the

above-referenced Chapter 11 debtor and debtor in possession (the "Debtor"), by and through its

attorneys, McGrail & Bensinger LLP, upon the filing of an Amended Plan of Reorganization for

Small Business Under Subchapter V of Chapter 11 [Dkt. No. 45], as revised [Dkt. No. 58] (the

"Amended Plan"); and it appearing that due notice of the hearing to consider confirmation of the

Amended Plan (the "Confirmation Hearing") having been given, and the solicitation of

acceptances or rejections of the Amended Plan having made, in the manner required by this Court

pursuant to the November 18, 2022 Order (I) Scheduling the Plan Confirmation Hearing; (II)

Setting an Objection Deadline for the Plan; (III) Approving Form of Notice Regarding the Hearing

on Plan Confirmation; (IV) Approving Form of Ballot; and (V) Setting a Voting Deadline to

Accept or Reject the Plan [Docket No. 56] (the "Scheduling Order"); and the Confirmation

Hearing having been held before the Court on December 29, 2022 and on January 26, 2023; and

upon the Declaration of Alexander Dulac in Support of Confirmation of the Amended Plan [Dkt.

No. 65], as amended [Dkt. Nos. 70 and 71], the Certification of Ilana Volkov, Esq. With Respect

to the Solicitation of Votes and Tabulation of Ballots cast on the Amended Plan (the "Certification

of Ballots") [Dkt. No. 64], the Supplemental Declaration of Alexander Dulac in Support of

Confirmation of the Amended Plan [Dkt. No. 67], the evidence proffered at the Confirmation Hearing, the arguments of counsel, and the entire record of this case; and after due deliberation and good and sufficient cause appearing therefor;

**IT IS HEREBY FOUND, THAT**:[1]

A.    This Court has jurisdiction over the matters presented pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Confirmation of the Amended Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and this Court has jurisdiction to determine whether the Amended Plan complies with the applicable provisions of Title 11, United States Code (the "Bankruptcy Code").

B.    On December 31, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Subchapter V of Chapter 11 (the "Bankruptcy Case"). The Debtor has remained in possession of its assets and affairs as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The Debtor was and is an entity eligible for relief under section 109 of the Bankruptcy Code. Jolene Wee is the duly appointed and acting Subchapter V Trustee pursuant to 11 U.S.C. § 1183.

C.    The procedures used to distribute the Amended Plan and applicable ballots, as set forth in the Certifications of Service identified in the Certification of Ballots, were good and sufficient, complied with the Scheduling Order, and no other or further notice is or shall be required.

---

[1] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to this proceeding pursuant to Fed. R. Bankr. P. 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

D.       The Amended Plan, attached as **Exhibit A**, as modified by this Confirmation Order, complies with all applicable provisions of the Bankruptcy Code, thereby satisfying Section 1129(a)(1) of the Bankruptcy Code.[2]

E.       The Debtor complies with the applicable provisions of the Bankruptcy Code, thereby satisfying Section 1129(a)(2) of the Bankruptcy Code.

F.       The Debtor has proposed the Amended Plan (and all other documents necessary to effectuate the Amended Plan) in good faith, with the legitimate and honest purpose of maximizing the value of the Debtor's estate, and not by any means forbidden by law, thereby satisfying Section 1129(a)(3) of the Bankruptcy Code.

G.       The Amended Plan provides that any payment made or to be made by the Debtor under the Amended Plan, for services or for costs and expenses in, or in connection with, the Bankruptcy Case, or in connection with the Amended Plan and incident to the Bankruptcy Case, has been approved by, or is subject to the approval of, the Court as reasonable. Accordingly, Section 1129(a)(4) of the Bankruptcy Code is satisfied.

H.       The Amended Plan discloses the identity and affiliations of any individual proposed to serve, after confirmation, as a director, officer, or voting trustee of the Debtor, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy. Also, the Debtor has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.  Accordingly, Section 1129(a)(5) of the Bankruptcy Code is satisfied.

---

[2] Unless otherwise stated, all capitalized terms used but not defined herein shall have the meaning ascribed to them in the Amended Plan.

3

I.      Section 1129(a)(6) of the Bankruptcy Code is not applicable as no government regulatory commission has jurisdiction over any rates charged by the Debtor.

J.      Classes 1 and 2 are impaired under the Amended Plan. The Debtor did not solicit a vote from the Class 1 holder as he is an insider. Class 2 has voted to reject the Amended Plan, but will receive or retain under the Amended Plan on account of the claims of that Class property of a value, as of the effective date of the Amended Plan, that is not less than the amount that the holders of such claims would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on such date. Accordingly, Section 1129(a)(7) of the Bankruptcy Code is satisfied.

K.      Section 1129(a)(8) of the Bankruptcy Code is not satisfied; therefore, the Court has been asked to confirm the Amended Plan pursuant to Section 1191(b) of the Bankruptcy Code.

L.      All Allowed Administrative Expense Claims and Non-Tax Priority Claims will be paid in full on the later of the Effective Date of the Amended Plan or thirty (30) days after the Claim becomes an Allowed Claim, or as otherwise agreed to by the parties. Therefore, the treatment of Administrative Expense Claims and Non-Tax Priority Claims under the Amended Plan satisfies the requirements of Sections 1129(a)(9)(A) and (B) and 1191(e) of the Bankruptcy Code.

M.      Section 1129(a)(9)(C) of the Bankruptcy Code is satisfied in that the Allowed Priority Tax Claim will be paid, in full in cash, on the Effective Date of the Amended Plan or, to the extent an agreement with said tax creditor cannot be reached, payment will be made in full on the later of the Allowance of the Claim or thirty (30) days of the Effective Date.

N.      Class 2, the only Class under Section 1129(a)(10) of the Bankruptcy Code entitled to vote whose vote counts, has voted to reject the Amended Plan. Because Section 1129(a)(10) of

the Bankruptcy Code is not satisfied, the Court has been asked to confirm the Amended Plan pursuant to Section 1191(b) of the Bankruptcy Code.

O.      The feasibility requirement of section 1129(a)(11) of the Bankruptcy Code is satisfied as the Amended Plan, together with the projections submitted in support of confirmation thereof, demonstrate that the Debtor will generate sufficient funds to satisfy the payment requirements of the Amended Plan. Therefore, confirmation is unlikely to be followed by liquidation or the need for further financial reorganization of the Debtor.

P.      In a Subchapter V bankruptcy case, the Debtor has no obligations to pay fees under 28 U.S.C. § 1930. As a result, Section 1129(a)(12) of the Bankruptcy Code is not applicable.

Q.      The Debtor has no obligation to provide any retiree benefits. As a result, Section 1129(a)(13) of the Bankruptcy Code is not applicable.

R.      The Debtor is not required to pay any domestic support obligations. As a result, section 1129(a)(14) of the Bankruptcy Code is inapplicable.

S.      Section 1129(a)(15) of the Bankruptcy Code is not applicable because the Debtor is not an individual and because Section 1181(a) excludes this section from Subchapter V.

T.      The Debtor is a for profit entity. As a result, Section 1129(a)(16) of the Bankruptcy Code is not applicable.

U.      The principal purpose of the Amended Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, and no party has objected to the Amended Plan on the grounds that its principal purpose is the avoidance taxes or the application of Section 5 of the Securities Act of 1933. Accordingly, the Amended Plan complies with Section 1129(d) of the Bankruptcy Code.

V.      The Amended Plan is dated and identifies the Debtor, who is the proponent of the Amended Plan, thereby satisfying Bankruptcy Rule 3016(a). Bankruptcy Rule 3016(b) regarding disclosure statements is inapplicable because Section 1181(b) excludes Section 1125 from Subchapter V, unless the Court orders otherwise, and the Court has not ordered otherwise. Finally, Bankruptcy Rule 3016(c) is inapplicable because the Amended Plan does not enjoin conduct not otherwise enjoined under the Bankruptcy Code.

W.      The Debtor does not have any executory contracts or unexpired leases; therefore, Sections 365(b) and 1123(b)(2) of the Bankruptcy Code are inapplicable.

X.      The Amended Plan complies with the applicable requirements of Section 1123(a) of the Bankruptcy Code in that it:

    a.   designates, subject to and in compliance with section 1122 of the Bankruptcy Code, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests;

    b.   specifies any class of claims or interests that is not impaired under the Amended Plan;

    c.   specifies the treatment of any class of claims or interests that is impaired under the Amended Plan;

    d.   provides the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

    e.   provides adequate means for its execution and implementation; and

6

    f.   contains only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the Amended Plan and any successor.

Y.    The Amended Plan does not discriminate unfairly and is fair and equitable with respect to the class of claims that are impaired under, and have not accepted, the Amended Plan, i.e., Class 2. Specifically, the Amended Plan provides that, as of the Effective Date:

    a.   all the Debtor's projected disposable income to be received in the 3-year period following the Effective Date, beginning on the date that the first payment is due under the Amended Plan, will be applied to make payments thereunder; and

    b.   The Debtor will be able to make all payments under the Amended Plan; or (i) there is a reasonable likelihood that the Debtor will be able to make all payments under the Amended Plan, and (ii) the Amended Plan provides appropriate remedies to protect the holders of claims or interests in the event payments are not made.

Z.    Therefore, the Amended Plan satisfies all applicable requirements for confirmation set forth in Sections 1129(a) and (b) and 1191(b) of the Bankruptcy Code.

AA.    The Court may properly retain jurisdiction over the matters set forth in the Amended Plan and section 1142 of the Bankruptcy Code.

Based upon the above findings of fact; and good and sufficient cause appearing therefor,

**IT IS ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Amended Plan, attached as **Exhibit A**, as modified herein, be and hereby is confirmed in accordance with, among other sections, the applicable provisions of sections 1129(a) and 1191(a) of the Bankruptcy Code; *provided, however,* to the extent there is any direct

7

conflict between the terms of the Amended Plan and the terms of this Confirmation Order, the

terms of this Confirmation Order shall control. The terms of the Amended Plan are an integral

part of this Confirmation Order and hereby are incorporated herein by reference and "So

Ordered" in their entirety.

    a.    The Amended Plan hereby is modified to remove the highlighted language below

        from Section 8.5 thereof:

<u>Limitation of Liability</u>. The Debtor and its members/managing member, the Debtor's Professionals and the Subchapter V Trustee shall have no liability whatsoever for any act or omission in connection with, or arising out of, the pursuit of approval of the Plan, or confirmation of the Plan, or the consummation of the Plan, or the transactions contemplated and effectuated by the Plan or the administration of the Plan or the property to be distributed under the Plan, or any other action or omission related to the administration of the Debtor's estate, or in contemplation of this Chapter 11 case, except for willful misconduct, gross negligence professional malpractice, fraud, or criminal conduct as determined by a Final Order of the Court and, in all respects will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

    b.    Accordingly, the words "or in contemplation of this Chapter 11 case" hereby are

        deleted from Section 8.5 of the Amended Plan.

    c.    The Amended Plan further is modified to replace the cash flow projections attached

        as <u>Exhibit B</u> thereto with the cash flow projections attached hereto as **Exhibit B**.

        Accordingly, the treatment of Holders of Allowed General Unsecured Claims in

        Class 2, as described in Article 4.1 of the Amended Plan, is replaced with the

        following language after the reference to "Initial Unsecured Creditor Payment;"

and, thereafter, (ii) the Debtor's projected disposable income for three (3) years as set forth in <u>Exhibit B</u> to the Confirmation Order: for the year 2024, the estimated amount of **$65,065** will be made by the Debtor to the Disbursing Agent by January 31, 2025; for the year 2025, the estimated amount of **$123,620** will be made to the Disbursing Agent by January 31, 2026; and for the stub period of January 2026, the estimated amount of **$19,935** will be made to the Disbursing Agent by March 31, 2026, for a total Pro Rata distribution of approximately eighteen (18) percent....

    d.    Since the Plan is confirmed under 1191(b), the Subchapter V Trustee will be

serving as the Disbursing Agent under the Plan. If the Debtor makes timely payments to the Disbursing Agent, the Disbursing Agent will make Pro Rata plan distributions to unsecured creditors by February 28, 2025, for the year 2024's disposable income; February 28, 2026, for the year 2025's disposable income; and April 30, 2026, for the stub period of January 2026. If the Debtor fails to make plan payments to the Disbursing Agent, she will file a notice of default with the Court notifying parties in interests of the default.

    e.   Article 5.1 of the Amended Plan is amended as follows:

The Debtor may continue to prosecute any objection to any claim filed prior to confirmation of the Plan after the Effective Date. Any Claim subject to an objection which has not been adjudicated by Final Order or otherwise resolved prior to Confirmation will be treated as a Disputed Claim under the Plan. Any objections to Claims shall be filed by the Debtor no later than sixty (60) days after the Effective Date, which deadline may be extended by the Court upon application or motion of the Debtor without notice filed prior to the deadline. In the event that any proof of claim is filed, asserted or amended after the Effective Date, the Debtor shall have sixty (60) days from the date of such filing or notice to object to such claim, which deadline may be extended by the Court upon application or motion of the Debtor without notice filed prior to the deadline. All objections shall be litigated (or settled) to Final Order. The Bankruptcy Court shall retain jurisdiction to adjudicate any and all objections to claims whether filed prior to or after the Effective Date.

    2.   To the extent any objections to the Amended Plan were not resolved or withdrawn, all objections, whether raised formally or informally, and specifically including the Objection filed by PCP Capital Partners, LLC [Dkt. No. 52], are overruled.

    3.   The treatment of Claims and Interests as provided in the Amended Plan is approved.

    4.   All parties seeking payment of an Administrative Expense Claim arising prior to the Effective Date, including the Subchapter V Trustee, must file a final fee application with the Court no later than thirty (30) days after the Debtor files and serves a notice of occurrence of the Effective Date. The Administrative Expense Claims estimated in Section 3.2 of the Amended Plan are merely estimations of the amounts due. Any Administrative Expense Claim not asserted as set forth herein shall be deemed Disallowed under the Amended Plan and the Holder thereof shall be enjoined from asserting any Claim to collect, offset, recoup or recover

such Claim against the Debtor, the Reorganized Debtor or any of their assets or property. The Debtor or Reorganized Debtor, as the case may be, shall continue to pay allowed Administrative Expense Claims as and when funds are available until all such Allowed Administrative Expense Claims are paid in full, and shall provide professionals with periodic reports reflecting all income and expenses. The failure by the Debtor to pay Allowed Administrative Expense Claims as and when due shall entitle the particular professional to seek appropriate relief from the Court, including requesting conversion of the Bankruptcy Case to a Chapter 7 case.

5.   The Debtor hereby is authorized to execute, deliver, file, or record such contracts, instruments, and other agreements or documents and take such action as may be necessary or appropriate to effectuate and implement the terms and conditions of the Amended Plan including, but not limited to, the sale of the Wedding Band Assets and the Planning App Graphics to One Road Home, Inc.

6.   The Court shall retain exclusive jurisdiction over the Bankruptcy Case, including exclusive jurisdiction over all controversies, disputes, and suits which may arise in connection with the interpretation or enforcement of the Amended Plan and this Confirmation Order or in connection with the enforcement of remedies under the Amended Plan and this Confirmation Order.

7.   The discharge provisions contained in Sections 8.1 and 8.2, and the injunction provision contained in Section 8.4, of the Amended Plan are deemed incorporated herein by reference, as if set forth herein in full, and are approved in all respects and shall be effective as provided for in the Amended Plan and sections 1192 of the Bankruptcy Code.

8.   The provisions of the confirmed Amended Plan shall bind the reorganized Debtor, and any creditor or other party in interest, whether or not the claim or interest of such creditor or

party in interest is impaired under the Amended Plan, and whether or not such creditor or party in interest has accepted the Amended Plan.

9.    Failure specifically to include or reference particular sections or provisions of the Amended Plan or any related agreement in this Confirmation Order shall not diminish or impair the effectiveness of such sections or provisions, it being the intent of the Bankruptcy Court that the Amended Plan be confirmed, and such provisions and related agreements be approved in their entirety.

10. No later than fourteen (14) days after the Amended Plan's substantial consummation, the Debtor shall file with the Court and serve on the Subchapter v Trustee, the United States Trustee and all parties in interest notice of such substantial consummation in accordance with Section 1183(c)(2) of the Bankruptcy Code.

Dated: New York, New York
       February 5, 2023

                                        /s/ James L. Garrity, Jr.
                                        THE HONORABLE JAMES L. GARRITY, JR.
                                        UNITED STATES BANKRUPTCY JUDGE

# Exhibit A

**MCGRAIL & BENSINGER LLP**
888-C 8th Avenue #107
New York, New York 10019
Ilana Volkov, Esq.
Pearl Shah, Esq.
(201) 931-6910 (phone)
ivolkov@mcgrailbensinger.com

*Counsel for Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------- X
In re:

FIRST STEP TRADEMARKS, LLC,

                Debtor.
-------------------------------------------------- X

Chapter 11
Subchapter V
Case No.: 21-12147 (JLG)

## AMENDED PLAN OF REORGANIZATION FOR
## SMALL BUSINESS UNDER SUBCHAPTER V OF CHAPTER 11

    First Step Trademarks, LLC, debtor and debtor in possession herein (the "Debtor"), hereby proposes the following Amended Plan of Reorganization for Small Business Under Subchapter V of Chapter 11 (the "Plan").

    You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on the Plan.

    Your rights may be affected by this Plan. You should consider discussing this document with an attorney.

## BACKGROUND[1]

### A. Description and History of the Debtor's Business.

    The Debtor is a Delaware limited liability company, which was founded by Alexander Dulac. Mr. Dulac owns approximately 65% of the Debtor's membership interests. The Debtor owns and operates a web-based business called The Plunge; its website is https://www.theplunge.com. The Plunge provides grooms with wedding-related information online including with respect to proposals, engagement rings, honeymoons, bachelor parties, attire,

---

[1] This Plan is for a small business debtor under Subchapter V of Chapter 11 of the Bankruptcy Code. Section 1190 of the Bankruptcy Code requires that such a plan include "(A) a brief history of the business operations of the debtor; (B) a liquidation analysis; and (C) projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization." The information in this section of this Plan is provided for that purpose.

and select wedding day responsibilities. The Plunge also launched an email system, customized to a couple's wedding date, and has layered in various tools to serve as a broader resource for grooms.

Originally founded in 2011, the Debtor's business kicked into full gear at the end of 2016 when it raised its first notable outside funds. Throughout the years, the Debtor secured outside investments and/or funding in the total amount of $2,362,500. The proceeds of these capital raises were used to build out the Company's core media assets (including content, email and tools), design a wedding band business and fund general operating expenses.

The latest investment closed during the summer of 2019, for a total of $992,500. This latest fund raise allowed the Debtor to target its efforts on making The Plunge a more complete, all-in resource for grooms in key categories, with deeper dives into travel, jewelry, fashion, proposals, gifting, wedding planning, and finances, and to add more value to grooms and brides who signed-up for emails or who were googling for relevant content. In turn, this significant growth in content enabled the Debtor to redirect its time and resources to rebuilding its custom email system, which then served as a platform for distributing its newly created content.

During this time, the Debtor also started constructing two other tools, including a custom quiz and playbook to learn more about its audience and to serve as a lead magnet, and a "who's coming to the wedding" tool. Although all the designs, illustrations and majority of the coding was completed for these tools by March 2020, the Debtor decided at the onset of the COVID-19 pandemic to prioritize its limited financial resources on completing the email system and going live with previously written content, tabling those other key tools until weddings fully resumed. Going into the pandemic, the Debtor also completed the branding and designs for a direct-to-consumer wedding band business and had worked on the design of a wedding-related mobile application.

After the Debtor launched the core media assets, it planned to turn its attention to monetizing them ahead of summer and fall 2020 weddings. The Debtor also planned to leverage the website to drive traffic to its wedding band business.

Unfortunately, with the onset of the global COVID-19 pandemic, those plans were placed abruptly on hold. The pandemic devastated the wedding industry, as most weddings were cancelled, rescheduled or significantly reduced in budget for more than 15 months. Moreover, the pandemic created material day-to-day uncertainty and lack of visibility as to when weddings would resume to pre-pandemic levels for the vast majority of the country. Accordingly, the Debtor's business was placed on hold pending a clearer and more certain path to the return of weddings.

## B. The Debtor's Chapter 11 Bankruptcy Filing.

The Debtor filed its Chapter 11 bankruptcy petition on December 31, 2021 (the "Petition Date"). The Debtor's financial difficulties were exacerbated by the onset of the global COVID-19 pandemic, which had a particularly devastating effect on the wedding industry. As a result of the pandemic, most weddings were cancelled, rescheduled, or significantly reduced in budget for more than 15 months.

In addition, one investor group holding a convertible promissory note in the principal amount of $600,000 (i) threatened litigation starting in October 2020 unless repaid immediately and, ultimately, (ii) sued the Debtor for repayment of the note in September 2022. This litigation overhang severely impeded the Debtor's ability to obtain much needed new capital in time for the resumption of the wedding business and to capitalize on the significant investments theretofore made.

### C. The Debtor's Assets.

The Debtor estimates the book value of its assets as of the Petition Date to be $351,000. Those assets consist primarily of intellectual property and good will.

### D. The Debtor's Liabilities.

The total of scheduled claims and proofs of claim filed is $2.59 million; however, there is an overlap between the proofs of claim and the scheduled amounts to the extent of approximately $758 thousand. Accordingly, the Debtor estimates its general unsecured liabilities to total approximately $1.3 million.

The Debtor has examined all proofs of claim which have been filed in this case and plans to object to the following unsecured claims, which do not comport with its books and records:

| Creditor | Scheduled Claim Amount | Proofs of Claim Amount | Objection Amount/Dispute | Reason |
|----------|------------------------|------------------------|--------------------------|--------|
| Ward Mooney | $0 | $100,000 | $100,000 | Objecting as noteholder automatically converted to common stock |
| Rebel Capital, LLC | $0 | $100,000 | $100,000 | Objecting as noteholder automatically converted to common stock |
| Christopher Donnelly | $0 | $20,000 | $20,000 | Objecting as noteholder automatically converted to common stock |
| Plunge Group 2019 LLC | $0 | $241,920 | $241,920 | Objecting as noteholder automatically converted to common stock |

| Nico Trinkhaus | $0 | $30,864.02 | $30,864.02 | Does not comport with books and records. |
| Strand Studio LLC | $5,000 | $10,000 | $5,000 | Included Strand Studio on Scheduled Claims, but its principal Lacey Waterman filed duplicate claim. |
| Department of Labor | $10,416 | $24,019.21 | $13,603.21 | Included Jake Masucci on Scheduled Claims, but Department of Labor filed duplicate claim. |
| **Total** | | $526,803.23 | $511,387.23 | |

### E. Liquidation Analysis.

To confirm this Plan, the Court must find that all creditors who do not accept this Plan will receive at least as much under this Plan as such claim holder would receive in a chapter 7 liquidation. For purposes of demonstrating this requirement, the Debtor has prepared a liquidation analysis attached hereto as <u>Exhibit A</u>. The liquidation analysis does not include any avoidance actions as the Debtor is not aware of the existence of any such actions. The liquidation analysis shows that if the Plan is not confirmed and the Debtor's case is converted to chapter 7 as a result, creditors will receive no distribution.

### F. Ability to Make Future Plan Payments and Operate Without Further Reorganization.

The Debtor also must show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the Debtor's business. For purposes of demonstrating this requirement, the Debtor has prepared projected financial information attached hereto as <u>Exhibit B</u> (the "Cash Flow Projections"), which reflects that the Debtor will have projected disposable income (as defined by § 1191(d) of the Bankruptcy Code) for three years to make distributions to holders of Allowed Claims.

4

## ARTICLE I
## SUMMARY

The Plan proposes to pay creditors of the Debtor from funds generated by the Debtor's operations as a going concern.

The Plan provides for:       One (1) class of (non-tax) priority claims
One (1) class of general unsecured claims;
One (1) class of Equity Interests; and
One (1) class of Options.

The Plan provides for the full payment of Allowed priority claims in accordance with the Bankruptcy Code. General unsecured creditors holding Allowed Claims will receive the Initial Unsecured Creditor Payment (as defined below) and distributions of the Debtor's projected disposable income for the years ended 2023, 2024 and 2025, as set forth in Exhibit B over a period of three (3) years from the Effective Date. The Debtor reasonably estimates that the total recovery to holders of Allowed General Unsecured Claims will be approximately eighteen percent (18%), but the actual distribution(s) percentage will depend on the total final Allowed General Unsecured Claims and potential post-confirmation costs should the Plan be confirmed nonconsensually under §1191(b).[2] The Plan further provides for the continued retention of Equity Interests and the cancellation of Options.

All creditors should refer to Articles III through VI of the Plan for information regarding the precise treatment of their claim.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTEREST

**2.1**       **Class 1 Claims – (Non-Tax) Priority Claims.**

Class 1 Claims consist of the Allowed Claim of Alexander Dulac for services rendered to the Debtor within 180 days before the Petition Date.

**2.2**       **Class 2 Claims – Unsecured Claims.**

Class 2 Claims consist of Allowed General Unsecured Claims.

**2.3**       **Class 3 Interests – Equity Interests.**

Class 3 consists of Membership Interests in the Debtor.

---

[2] Potential post-confirmation costs may include the cost of procuring a bond for the Subchapter V Trustee and her services rendered as Disbursing Agent. The Subchapter V Trustee will be compensated at her applicable billing rate, which may be adjusted annually. Her 2022 billing rate is $575 an hour.

5

**2.4    Class 4 Interests – Options.**

Class 4 consists of Options.

**ARTICLE III**
**TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS,**
**AND COURT FEES**

**3.1    Unclassified Claims.**

Pursuant to § 1123 of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified.

**3.2    Administrative Expense Claims.**

Each holder of an Allowed Administrative Expense Claim will be paid in full on the later of (i) the Effective Date of the Plan or (ii) thirty (30) days after such Claim becomes Allowed, or upon such other terms as may be agreed upon by the holder of the Claim and the Debtor.[3] The estimated Administrative Expense Claims through the date of the filing of this Plan are as follows:

| Name | Title | Amount |
|------|-------|--------|
| McGrail & Bensinger LLP | Counsel to Debtor | $75,000[4] |
| Jolene Wee | Subchapter V Trustee | $10,000 |

**3.3    Priority Tax Claims**

Secured and priority tax claims have been asserted by the New York Department of Taxation ("NYDT") in the total approximate amount of $1,000. Based on discussions the Debtor has had with the NYDT, the Debtor reasonably believes that the NYDT will agree to reclassify those claims to General Unsecured Claims.  To the extent an agreement cannot be reached, the Plan provides for payment in full of said tax claims on the later of the Allowance of the Claim or thirty (30) days of the Effective Date.

**3.4    Statutory Fees**

N/A.

---

[3] Mr. Dulac has not received any reimbursement for services rendered to the Debtor since the Petition Date.  He believes he holds an Administrative Claim for unpaid monthly reimbursements for the period January 1, 2022, to the Effective Date.  Said claim will be paid starting in 2026 after, and conditioned upon, the funding of the final payment to holders of Allowed General Unsecured Claims of the Reorganized Debtor's disposable income for the year 2025.  His agreement to defer payment of his Administrative Claim applies only in the event the Plan is confirmed; in the event the Plan is not confirmed and this case is converted to Chapter 7, Mr. Dulac advises he does not agree to the deferment/subordination of his Administrative Claim.
[4] This amount includes the retainer of $21,096.50 being held by Debtor's counsel; fees and expenses will continue to accrue through the Effective Date of the Plan.

## ARTICLE IV
## TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

4.1    Claims and interests shall be treated as follows under the Plan:

| Class | Impairment | Scheduled Amount | Treatment |
|-------|-----------|------------------|-----------|
| Class 1 – Priority Non-Tax Claims | Impaired | $60,000 (subject to a cap of $13,650) | Class 1 consists of the Allowed Priority Non-Tax Claim of Alexander Dulac. In full satisfaction of this Allowed Priority Claim, Mr. Dulac will receive the sum of $6,825 in 2024 and $6,825 in 2025. The balance of the Allowed Priority Claim will be included in Class 2.<br><br>Class 1 Claims is impaired and, therefore, entitled to vote on the Plan. However, because the Class 1 creditor is an "insider" and his vote does not count, he will not receive a ballot. |
| Class 2 – Unsecured Claims | Impaired | $1,289,907.67[5] | Class 2 consists of Allowed General Unsecured Claims. In full satisfaction of its Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim will receive a Pro Rata distribution of: (i) within the later of thirty (30) days of the Effective Date or Allowance of the Claim, the sum of $25,000 (the "Initial Unsecured Creditor Payment"); and, thereafter, (ii) the Debtor's projected disposable income for three (3) years as set forth in Exhibit B: for the year 2023, the estimated amount of **$19,435** will be made by January 31, 2024; for the year 2024, the estimated amount of **$65,065** will be made by January 31, 2025; and for the year 2025, the estimated amount of **$123,620** will be made by January 31, 2026, for a total approximate Pro Rata distribution of approximately eighteen (18) percent.[6] |

---

[5] The total Allowed amount of General Unsecured Claims may be affected by the claim objections brought by the Debtor and the Court's adjudication thereof.

[6] The actual distribution(s) percentage to holders of Allowed General Unsecured Claims will depend upon the pool of total Allowed General Unsecured Claims.

| Class 3 – Equity Interests | Unimpaired | N/A | Class 3 consists of Allowed Equity Interests. Upon the Effective Date of the Plan, each holder of an Allowed Equity Interest shall retain such Interests. Class 3 Interests are unimpaired and, therefore, holders of Class 3 Equity Interests are deemed to have accepted the Plan. |
| Class 4 – Options | Impaired | N/A | Class 4 consists of Options. Upon the Effective Date of the Plan, all Options will be cancelled. Class 4 Interests are impaired; because Class 4 will receive no distribution under the Plan, Class 4 is presumed to have rejected the Plan. |

## ARTICLE V
## ALLOWANCE AND DISALLOWANCE OF CLAIMS

**5.1    Objections to Claims.**

The Debtor may continue to prosecute any objection to any claim filed prior to confirmation of the Plan after the Effective Date. Any Claim subject to an objection which has not been adjudicated by Final Order or otherwise resolved prior to Confirmation will be treated as a Disputed Claim under the Plan. Any objections to Claims shall be filed by the Debtor no later than one hundred and twenty (120) days after the Effective Date, which deadline may be extended by the Court upon application or motion of the Debtor without notice filed prior to the deadline. In the event that any proof of claim is filed, asserted or amended after the Effective Date, the Debtor shall have one hundred twenty (120) days from the date of such filing or notice to object to such claim, which deadline may be extended by the Court upon application or motion of the Debtor without notice filed prior to the deadline. All objections shall be litigated (or settled) to Final Order. The Bankruptcy Court shall retain jurisdiction to adjudicate any and all objections to claims whether filed prior to or after the Effective Date.

**5.2    Disputed Claim Reserve.**

No distribution will be made on account of a Disputed Claim unless such Claim is Allowed. On any date that distributions are to be made under the terms of this Plan, the Disbursing Agent shall deposit in one or more accounts (either an attorney escrow account or a segregated account with a banking institution that is a depository authorized by the United States Trustee for bankruptcy cases in the Southern District of New York), cash equal to 100% of the cash that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto, including, but not limited to (i) Disputed Claims that may be entitled to treatment as administrative expenses or as priority claims pursuant to §§ 503 and 507 of the Bankruptcy

Code, (ii) claims of governmental units for any tax and (iii) any amount due but not payable on the Effective Date on account of administrative expenses or claims entitled to priority pursuant to §§ 503 and 507 of the Bankruptcy Code. The Disbursing Agent shall also segregate any interest, dividends or proceeds of such cash. Such cash together with any interest, dividends or proceeds thereof, SHALL be held in trust for the benefit of the holders of all such Disputed Claims pending determination of their entitlement thereto. Within fourteen (14) days after the entry of a Final Order resolving an objection to a Disputed Claim, the Disbursing Agent shall distribute all cash, including any interest, dividends or proceeds thereof, to which a holder is then entitled with respect to any Disputed Claim that has become an Allowed Claim.

## ARTICLE VI
## MEANS FOR IMPLEMENTATION OF THE PLAN

**6.1    Funding of the Plan.**

On the Effective Date, the Debtor will have entered into an asset purchase agreement or similar document of conveyance with One Road Home, Inc., a newly formed entity ("ORH"), pursuant to which the Debtor will sell and transfer to ORH, and ORH will buy from the Debtor, the Wedding Band Assets and the Planning App Graphics  for the sum of $75,000 (the "Purchase Price").[7] Additionally, on the Effective Date, ORH will provide the Reorganized Debtor with a drawdown loan facility in the total amount of $12,500 (the "Loan"), the proceeds of which will be used to fund go forward business operations as set forth in the Cash Flow Projections. The proceeds of the Purchase Price will be used to fund (a) payments to Allowed Priority Tax Claims and Allowed Administrative Expense Claims as well as (b) the Initial Unsecured Creditor Payment.

Additionally, on the Effective Date, the Debtor and ORH will enter into one or more Service Agreements/Media Agreements pursuant to which ORH will pay the Debtor to run ads on The Plunge platform.  The anticipated revenue the Reorganized Debtor will receive from these agreements is reflected in the Cash Flow Projections.

One Road ("OR"), which is distinct in name from The Plunge, will be selling men's wedding bands directly to consumers through its own website. Every year, there are approximately two million weddings in the U.S. (absent the COVID timeframe), with the vast majority of men buying a wedding band. The Plunge, and other strategic outlets developed exclusively by Mr. Dulac, will drive traffic to OR's website. OR will advertise its business on The Plunge and pay advertising money to the Debtor in exchange. OR's fixed, contractual relationship with the Debtor is significantly more beneficial to the Debtor than the more typical automated programmatic advertising where brands generally bid on an exchange for advertising on the site at commoditized levels (wherein The Plunge would receive only about $1,000 per month in revenue given its very niche, sub-scale audience). ORH plans to soft launch the wedding band business

---

[7]  The graphic designs, product samples, branding, and packaging that have been developed to date for the wedding band and planning app business have little or no inherent value; accordingly, the Purchase Price is a reflection more of the funds necessary to confirm the Plan than the actual value (if any) of these assets.

approximately four months after the Effective Date and to hard launch three months thereafter when it plans to market on The Plunge more comprehensively.

Once the wedding band business is inaugurated, ORH will focus on launching the Planning App, which will also be distinct in name from The Plunge. The Planning App is still in its early stages of development, having only preliminary graphic designs. However, Mr. Dulac has identified talented partners to work with to develop this business. Mr. Dulac anticipates that the Planning App will have a soft launch in the fourth quarter of 2023 and a hard launch in the first quarter of 2024. The Planning App will be marketed across multiple distribution channels, including on The Plunge. The Planning App will pay The Plunge advertising dollars pursuant to a contractual relationship in exchange for traffic and leads. It is anticipated that the Planning App will generate income from advertising and partnerships in the travel business, as well as from other sources; in turn, from this revenue, the Planning App will be able to comply with its contractual arrangement with The Plunge.

Finally, going into 2024, with both the Wedding Band business and the Planning App launched, The Plunge plans to partner with other companies seeking to reach The Plunge audience, across other verticals, namely in suiting, honeymoons and other decision grooms are involved in. Mr. Dulac will be leading this partnership effort and will have the benefit of the full year of 2023 to finalize these partnerships.

The distributions that are to be made on and after the Effective Date under this Plan shall be funded from the Purchase Price and the Reorganized Debtor's business operations. In the event the Court approves this Plan as a consensual Plan, then the Reorganized Debtor shall be the Disbursing Agent responsible for making any and all post-Confirmation payments that are required under the Plan. In the event the Court approves this Plan by cramdown, the Debtor proposes the Subchapter V Trustee to serve as the Disbursing Agent.

**6.2    Post-Confirmation Management.**

The Debtor's post-confirmation operations will continue to be managed by Alexander Dulac. Mr. Dulac's compensation shall consist of $3,000 in salary in 2023, $60,000 in 2024 and $75,000 in 2025, all as reflected more specifically in the Cash Flow Projections.

Mr. Dulac also will have an ownership and management role in ORH. On the Effective Date, he will own 100% of ORH's membership interest, which will be subject to dilution as a result of the conversion of SAFE notes issued to current and prospective investors. He will be ORH's CEO.

10

## ARTICLE VII
## GENERAL PROVISIONS

**7.1    Definitions and Rules of Construction.**

The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan, and they are supplemented by the following definitions:

(i)    "Administrative Expense Claim" means any cost or expense of administration of the Chapter 11 case entitled to priority under Section 507(a)(2) of the Code and allowed under Section 503(b) of the Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the Petition Date, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Subchapter V Trustee for fees and/or reimbursements, and any fees or charges assessed against the Debtor's estate under Chapter 123, Title 28, United States Code (which is not applicable in a Subchapter V case).

(ii)    "Allowance" means when a Claim becomes an Allowed Claim.

(iii)    "Allowed" or "Allowed Claim" means any Claim or Interest against the Debtor that is scheduled by or on behalf of the Debtor as not disputed, contingent or unliquidated, or proof or request for payment of which has been filed timely with the Bankruptcy Court and, in either case, a Claim (a) as to which no objection has been interposed within one hundred twenty (120) days after the Effective Date or (b) as to which an objection has been interposed and such Claim has been allowed by a Final Order of the Bankruptcy Court.

(iv)    "Bankruptcy Code" means title 11 of the United States Code (11 U. S.C. §§ 1101, *et seq.*).

(v)    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as in effect on the Filing Date and as amended after the Filing Date and during the Debtor's chapter 11 case.

(vi)    "Claim" means any right to payment from the Debtor and/or any or all of the Released Parties arising, or with respect to which the obligation giving rise to such right has been incurred, before the Effective Date of this Plan, and based upon, concerning, relating to, or in any manner arising from, in whole or in part, the Debtor and/or the Debtor's operations, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or any right to an equitable remedy for breach of performance arising, or with respect to which the obligation giving rise to such right has been incurred, before the Effective Date, if such breach gives rise to a right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

11

unsecured. FOR THE AVOIDANCE OF DOUBT, "CLAIM" SHALL SPECIFICALLY AND EXPRESSLY INCLUDE ALL CLAIMS UNDER FEDERAL, STATE AND/OR LOCAL LAW OR REGULATION.

(vii)   "Confirmation Date" means the date on which the Court enters the Confirmation Order.

(viii)  "Confirmation Order" means an order of the Bankruptcy Court confirming the Plan.

(ix)    "Disputed Claim" means (a) any Claim that is listed in the Schedules as disputed, contingent or unliquidated and with respect to which no Proof of Claim has been filed; and (b) any Claim, or portion thereof, that has not been disallowed and with respect to which an objection or action concerning the allowance and/or extent thereof, in whole or in part, has been interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, to the extent that any such objection or action has not been resolved by a Final Order.

(x)     "Debtor's Professionals" means such attorneys, accountants and/or other professionals employed by the Debtor in connection with this case.

(xi)    "Disbursing Agent" means, if a consensual Plan, the Reorganized Debtor; if a nonconsensual Plan, the Subchapter V Trustee.

(xii)   "Effective Date" means the first business day following the date that is fourteen (14) days after the entry of the order confirming this Plan. If, however, a stay of the confirmation order is in effect on that date, the Effective Date will be the first business day after the date on which the stay expires or is otherwise terminated.

(xiii)  "Equity Interest" means a membership unit in the Debtor.

(xiv)   "Final Order" means an order of a court as to which (a) any appeal that has been taken has been determined finally or dismissed or (b) the time for appeal has expired and (i) no timely appeal has been filed and (ii) no order having the effect of tolling or otherwise extending the appeal period is in effect.

(xv)    "General Unsecured Claim" means any Claim that is not an Administrative Expense Claim, a Priority Non-Tax Claim or a Priority Tax Claim.

(xvi)   "Options" means the option to buy Equity Interests.

(xvii)  "Planning App" means an application downloadable by users to their mobile devices in order to help with planning and organizing group events.

(xviii) "Planning App Graphics" means preliminary graphic designs and related intellectual property for the Planning App.

12

(xix) "Priority Non-Tax Claim" means any Claim entitled to priority in payment under Section 507(a)(4) and (a)(5) of the Bankruptcy Code.

(xx) "Priority Tax Claim" means any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

(xxi) "Pro Rata" means, with respect to any Allowed Claim, the proportions that such Allowed Claim bears to the aggregate amount of all claims in such class.

(xxii) "Reorganized Debtor" means the Debtor in its post-Confirmation Order state.

(xxiii) "Wedding Band Assets" means all assets related to Debtor's wedding band business:

- o All domain names related to OneRoad, including oneroadbands.com;
- o All social media handles related to OneRoad;
- o All registered and non-registered trademarks for OneRoad, as used and/or registered in or outside the United States;
- o All packaging designs and samples, including the packaging system, sample box, final ring box and collateral;
- o All digital wedding band designs;
- o All physical samples of wedding bands;
- o All website graphic designs;
- o All brand books and related materials;
- o All writing books and related materials; and
- o Any and all other documents and intellectual property related to the wedding band business.

**7.2    Authority to Effectuate the Plan.**

Upon the Confirmation Order becoming a Final Order, all matters provided under the Plan shall be deemed to be authorized and approved without the requirement of further approval from the Bankruptcy Court or the Debtor. The Debtor shall be authorized, without further application to or order of the Bankruptcy Court to take whatever action necessary to achieve consummation and carry out the Plan and to effectuate the transactions provided for thereunder.

**7.3    Revesting of Assets.**

Consistent with §§ 1123(a)(5)(A) and 1141 of the Bankruptcy Code, except for the Wedding Band Assets and Planning App Graphics, title to all assets and property of the estate of the Debtor shall pass to, and vest in, the Reorganized Debtor free and clear of all Claims, Liens, charges and other rights of creditors arising prior to the Effective Date. On and after the Effective Date, the Reorganized Debtor may conduct its financial affairs and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court, except as otherwise provided in this Plan or in the Confirmation Order. Any distribution check that

13

is issued by the Reorganized Debtor but not deposited within one hundred twenty (120) days after its distribution will be deemed abandoned by such creditor and shall pass to and revert in the Reorganized Debtor free and clear of any claims to the distribution. No distribution(s) shall be made to any Allowed creditor if such distribution is $50.00 or less.

**7.4    Retention of Jurisdiction.**

Following the Confirmation Date and until such time as all payments and distributions required to be made and all other obligations required to be performed under the Plan have been made and performed and the Final Decree has been entered closing the Chapter 11 Case, the Bankruptcy Court shall retain jurisdiction over this proceeding under the provisions of the Bankruptcy Code, including, without limitation, § 1142(b) thereof and the Bankruptcy Rules, to ensure that the intent and the purpose of the Plan is carried out and given effect. Without limitation by reason of specification, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(a)    To consider any modification of the Plan pursuant to § 1127 of the Bankruptcy Code and/or any other modification of the Plan after substantial consummation thereof;

(b)    To hear and determine:

(i)    all controversies, suits and disputes, if any, as may arise in connection with the interpretation, implementation, consummation or enforcement of the Plan;

(ii)    all controversies, suits and disputes, if any, as may arise between or among the holders of any Class of Claim and the Debtor including, without limitation, proceedings to determine the allowance, classification, amount, or priority of Claims;

(iii)    all rights or Causes of Action which may exist on behalf of the estate, including actions commenced to recover preferential transfers, accounts receivable and other property of the estate;

(iv)    applications for allowance of compensation and expense reimbursement of the Debtor's Professionals, and the Subchapter V Trustee, for periods prior to the Effective Date;

(v)    any and all applications, adversary proceedings and litigated matters;

(vi)    to enter a final decree closing the Chapter 11 Case; and

14

> (vii)   to the extent not expressly provided for above, any and all disputes arising under the Plan and proceedings in aid of the administration and/or consummation of the Plan.

**7.5     Post-Confirmation Reporting.**

The Reorganized Debtor shall file and serve on the United States Trustee quarterly reports, within 15 days after the conclusion of each calendar quarter, until this case is converted, dismissed, or closed by entry of the Final Decree. Any such reports shall be prepared consistent with (both in terms of content and format) the applicable Bankruptcy Court and United States Trustee's Guidelines for such matters. Mr. Dulac shall be responsible for preparing the aforementioned quarterly reports.

**7.6     Tax Consequences of the Plan.**

Any party concerned with how the plan may affect their tax liability should consult with their own accountants, attorneys and/or other advisors.

**7.7     Headings.**

Headings are used in the Plan for convenience of reference only and shall not constitute a part of the Plan for any other purpose.

**7.8     Revocation.**

The Debtor shall have the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Plan is revoked or withdrawn, it shall be deemed null and void, and in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtor, or any other entity, or to prejudice in any manner, the rights of the Debtor or any entity in any further proceeding involving the Debtor.

**7.9     Binding Effect.**

If the Plan is confirmed, the provisions of the Plan will bind the Debtor and all holders of Claims and Equity Interests, whether or not they voted to accept the Plan.

The rights, benefits and obligations named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the Debtor and all holders of Claims, Equity Interests and their respective successors and assigns. The provisions of all documents executed under or in connection with this Plan shall be valid and enforceable and binding upon and inure to the benefit of the Debtor and all other parties thereto and their respective predecessors, successors, assigns, agents, officers and directors.

**7.10    Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of New York shall govern the construction and implementation of the Plan and, unless otherwise stated therein, any agreements, documents, and instruments executed in connection with the Plan.

**7.11    Saturday, Sunday or Legal Holiday.**

If any payment or act under the Plan is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day, but shall be deemed to have been completed as of the required date.

**7.12    Enforceability.**

Should any provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability or operative effect of any and all other provisions of the Plan.

**7.13    Confirmation Order Controls.**

To the extent, the Plan is inconsistent with the Confirmation Order, the provisions of the Confirmation Order shall be controlling.

**7.14    Reservation of Rights.**

Neither the filing of the Plan nor any statement or provision contained therein shall be or be deemed to be an admission against interest. In the event that the Effective Date shall not occur, neither the Plan nor any statement contained therein may be used or relied upon in any manner in any suit, action, proceeding, or controversy within or outside of the Chapter 11 Case.

**7.15    Substantial Consummation.**

The Plan will be deemed substantially consummated, as such terms is used in § 1101(2) of the Bankruptcy Code, upon the commencement of distributions to the holder of any Class of Claims under the Plan. Additionally, the services of the Subchapter V trustee shall terminate when the plan has been substantially consummated unless the Subchapter V trustee is serving as Disbursing Agent.

**7.16    Plan Default Remedies.**

In the event any payment required pursuant to the Plan is more than ten (10) days overdue, the Reorganized Debtor shall file a notice with the Court indicating the default(s) and its plans, if any, to cure the default(s). If the Disbursing Agent is not the Reorganized Debtor, the Disbursing

Agent shall notify the Court and the United States Trustee of any payment that is more than ten (10) days overdue. In the event of an uncured default, any aggrieved party shall be permitted to file a certification of default with the Court, on notice to the Reorganized Debtor, seeking such remedy as the aggrieved party deems appropriate including, but not limited to, seeking to convert the case to a case under chapter 7 of the Bankruptcy Code (which remedy the Reorganized Debtor shall have the opportunity to contest).

**7.17    Final Decree.**

On notice to the United States Trustee, the Debtor will file an application and proposed order for a final decree pursuant to Bankruptcy Rule 3022, without prejudice to the Court's ability to reduce or extend the time to file such application.

**ARTICLE VIII**
**DISCHARGE; LIMITATION OF LIABILITY**

**8.1    Discharge.**

(a) If this Plan is confirmed under § 1191(a) of the Bankruptcy Code, on the Effective Date of the Plan, the Debtor will be discharged from any debt and/or Claim that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtor will not be discharged of any debt:

   (i)    imposed by this Plan; or

   (ii)    to the extent provided in § 1141(d)(6).

**8.2**    If this Plan is confirmed under § 1191(b) of the Bankruptcy Code, confirmation of this Plan does not discharge any debt provided for in this Plan until the Court grants a discharge on completion of all payments due within the first three (3) years of this Plan, or as otherwise provided in § 1192 of the Bankruptcy Code. The Debtor will not be discharged of any debt:

   (i)    on which the last payment is due after the first three (3) years of this Plan, or as otherwise provided in § 1192 of the Bankruptcy Code; or

   (ii)    excepted from discharge under § 523(a) of the Bankruptcy Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

**8.3    Continuation of Stays.**

In the event the Plan is confirmed under § 1191(a), all stays provided for in the Chapter 11 Case under § 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. In the event the Plan is confirmed under § 1191(b), the stay of an act against property of estate under § 362(a) shall terminate on Effective Date, and the stay of any other act under § 362(a) shall remain in full force

and effect until the Debtor receives the discharge under § 1191.

**8.4    Injunction.**

Effective on the Effective Date, all creditors who have held, hold, or may hold Claims against the Debtor or its assets are enjoined from taking any of the following actions against the assets of the Debtor with respect to such Claims (other than actions brought to enforce any rights or obligations under the Plan or appeals, if any, from the Confirmation Order): (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against the Debtor or the assets of the Debtor; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree or order against the Debtor or its assets; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor or the assets of the Debtor; (iv) asserting any set-off, right of subrogation or recoupment of any kind directly or indirectly against any obligation due the Debtor or its assets; and (v) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan.

**8.5    Limitation of Liability.**

The Debtor and its members/managing member, the Debtor's Professionals and the Subchapter V Trustee shall have no liability whatsoever for any act or omission in connection with, or arising out of, the pursuit of approval of the Plan, or confirmation of the Plan, or the consummation of the Plan, or the transactions contemplated and effectuated by the Plan or the administration of the Plan or the property to be distributed under the Plan, or any other action or omission related to the administration of the Debtor's estate, or in contemplation of this Chapter 11 case, except for willful misconduct, gross negligence professional malpractice, fraud, or criminal conduct as determined by a Final Order of the Court and, in all respects will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

## ARTICLE IX
### CONFIRMATION REQUEST

**9.1**     The Debtor hereby requests of the Plan pursuant to §§ 1129 and 1191 of the Bankruptcy Code.

Dated: October 14, 2022
         New York, New York

                                            Respectfully submitted,
                                            FIRST STEP TRADEMARKS, LLC

                             By:     /s/ *Alexander Dulac*
**READ AND APPROVED:**                       Alexander Dulac, Managing Director

/s/ *Ilana Volkov*
Ilana Volkov
Pearl Shah
McGrail & Bensinger LLP
888-C 8th Ave. #107
New York, NY 10019

*Counsel for Debtor and Debtor in Possession*

### EXHIBIT A – LIQUIDATION ANALYSIS

*Debtor's Estimated Chapter 7 Liquidation Value of Assets (as of September 30, 2022)*

| ASSETS | VALUE |
|---|---|
| Cash on hand | $3.69 |
| Intellectual Property/Good Will | $0.00 – $20,000 |
| Office Equipment | $300.00 |

| LIABILITIES | AMOUNT |
|---|---|
| Estimated Chapter 11 Administrative Expense Claims | $75,000[1] |
| Estimated Chapter 7 Administrative Claims | $10,000 |

*Balance available for unsecured claims:*        *$0.00*

---

[1] Mr. Dulac has not received any reimbursement for services rendered to the Debtor since the Petition Date. He believes he holds an Administrative Claim for unpaid monthly reimbursements for the period January 1, 2022, to the Effective Date. Said claim will be paid starting in 2026 after, and conditioned upon, the funding of the final payment to holders of Allowed General Unsecured Claims of the Reorganized Debtor's disposable income for the year 2025. As set forth in the Plan, his agreement to defer payment of his Administrative Claim applies only in the event the Plan is confirmed; in the event the Plan is not confirmed and this case is converted to Chapter 7, Mr. Dulac advises he does not agree to the deferment/subordination of his Administrative Claim.

CASH FLOW PROJECTIONS: November 1, 2022 - December 31, 2025     Exhibit B -

21-12147-jlg   Doc 58-2   Filed 11/21/22   Entered 11/21/22 12:51:25   Exhibit B -
Cash Flow Projections   Pg 1 of 1

| | Nov. | Dec. | 2022 | Q1 | Q2 | Q3 | Q4 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | | | |
| Wedding Band Advertising | | | | $1,000 | $2,948 | $10,266 | $14,509 | $28,724 | $64,651 | $100,185 |
| App Advertising | | | | | | | $8,391 | $8,391 | $52,994 | $67,015 |
| Plunge 3rd Party Partnerships | | | | | | | | | $35,000 | $60,000 |
| Drawdown Loan Facility (1) | $5,000 | $2,000 | $7,000 | $3,500 | $2,000 | | | $5,500 | | |
| IP Purchase | $75,000 | | $75,000 | | | | | | | |
| **Total Cash Receipts** | $80,000 | $2,000 | $82,000 | $4,500 | $4,948 | $10,266 | $22,900 | $42,615 | $152,645 | $227,200 |
| **TOTAL CASH DISBURSEMENTS** | | | | | | | | | | |
| **I. Compensation** | | | | | | | | | | |
| Alex Dulac | | | | | | $1,500 | $1,500 | $3,000 | $60,000 | $75,000 |
| **II. Site and Tech** | | | | | | | | | | |
| Coding | | | | $500 | $500 | $500 | $500 | $2,000 | $3,000 | $4,000 |
| Tech Services | $865 | $865 | $1,730 | $2,595 | $2,595 | $2,595 | $2,595 | $10,380 | $10,380 | $10,380 |
| **III. Other** | | | | | | | | | | |
| G&A (2) | $150 | $2,150 | $2,300 | $2,350 | $1,350 | $1,800 | $1,800 | $7,300 | $7,375 | $7,375 |
| Payment to Unsecured Creditors | $25,000 | | | | | | | | | |
| Priority Tax Claim | $1,000 | | | | | | | | | |
| Professional Fees (3) | $50,000 | | $50,000 | | | | | | | |
| Other Priority Claims (4) | | | | | | | | | $6,825 | $6,825 |
| **Total Cash Disbursements** | $77,015 | $3,015 | $80,030 | $5,445 | $4,445 | $6,395 | $6,395 | $22,680 | $87,580 | $103,580 |
| Beginning Cash | $80,000 | $2,985 | $0 | $1,970 | $1,025 | $1,528 | $5,400 | $1,970 | $21,905 | $86,970 |
| Ending Cash | $2,985 | $1,970 | $1,970 (5) | $1,025 | $1,528 | $5,400 | $21,905 | $21,905 | $86,970 | $210,590 |
| **Projected Disposable Income (Loss)** | -$77,015 | -$1,015 | -$78,030 | -$945 | $503 | $3,871 | $16,505 | $19,935 | $65,065 | $123,620 |

(1) ORH will provide a drawdown loan facility to the Debtor of up to $12.5K for working capital requirements, which will not be due for repayment until after 2026.

(2) Includes rent, legal, bookkeeping, accounting, T&E, and general liability insurance.

(3) Includes Debtor's counsel and Subchapter V Trustee.

(4) Priority Non-Tax Claim of $13,650 due to Alex Dulac.

(5) The ending cash balance for 2022 is not an amount that is available for distribution to creditors as it is dedicated to working capital needs for Q1 of 2023.

# Exhibit B

CASH FLOW PROJECTIONS 21-12147jlg Doc 72-2 Filed 02/07/23 Entered 02/07/23 10:42:24 Exhibit B
February 2023 - January 2026 Pg 2 of 2

| | Q1 | Q2 | Q3 | Q4 | 2023 | 2024 | 2025 | Jan 2026 |
|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | |
| Wedding Band Advertising | | | | | $14,214 | $64,651 | $100,185 | $14,509 |
| App Advertising | | $1,000 | $2,948 | $10,266 | | $52,994 | $67,015 | $7,951 |
| Plunge 3rd Party Ad Revenue | | | | | | $35,000 | $60,000 | $7,000 |
| Drawdown Loan Facility (1) | $10,000 | $3,000 | $2,000 | | $15,000 | | | |
| IP Purchase | $75,000 | | | | | | | |
| **Total Cash Receipts** | $85,000 | $4,000 | $4,948 | $10,266 | $104,214 | $152,645 | $227,200 | $29,460 |
| **TOTAL CASH DISBURSEMENTS** | | | | | | | | |
| **I. Compensation** | | | | | | | | |
| Alex Dulac | | | | $1,500 | $1,500 | $60,000 | $75,000 | $6,250 |
| **II. Site and Tech** | | | | | | | | |
| Coding | $500 | $500 | $500 | $500 | $2,000 | $3,000 | $4,000 | $409 |
| Tech Services | $2,595 | $2,595 | $2,595 | $2,595 | $10,380 | $10,380 | $10,380 | $865 |
| **III. Other** | | | | | | | | |
| G&A (2) | $4,350 | $1,350 | $1,800 | $1,800 | $9,300 | $7,375 | $7,375 | $2,000 |
| Payment to Unsecured Creditor | $25,000 | | | | | | | |
| Priority Tax Claim | $1,000 | | | | | | | |
| Professional Fees (3) | $50,000 | | | | | | | |
| Other Priority Claims (4) | | | | | | $6,825 | $6,825 | |
| **Total Cash Disbursements** | $83,445 | $4,445 | $4,895 | $6,395 | $99,180 | $87,580 | $103,580 | $9,524 |
| Beginning Cash (5) | $9,000 | $1,555 | $1,110 | $1,163 | $9,000 | $5,034 | $70,099 | $193,719 |
| Ending Cash | $1,555 | $1,110 | $1,163 | $5,034 | $5,034 | $70,099 | $193,719 | $213,654 |
| **Projected Disposable Income (Loss)** | -$7,445 | -$445 | $53 | $3,871 | -$3,966 | $65,065 | $123,620 | $19,935 |

(1) ORH will provide a drawdown loan facility to the Debtor of up to $15K for working capital requirements, which will not be due for repayment until after 2026.

(2) Includes rent, legal, bookkeeping, accounting, T&E, and general liability insurance.

(3) Includes Debtor's counsel and Subchapter V Trustee.

(4) Priority Non-Tax Claim of $13,650 due to Alex Dulac.

(5) Beginning Cash at Q1 2023 reflects starting cash after $75K payment to unsecured creditors, for professional fees and priority claim.